**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

2301 M CINEMA LLC D/B/A WEST END
CINEMA
   333 7th Street NE
   Washington, DC 20002

THE AVALON THEATRE PROJECT, INC.          Civil Action No. 1:17-cv-1990
   5612 Connecticut Avenue NW
   Washington, DC 20015

DENVER FILM SOCIETY
   1510 York Street, 3rd Floor
   Denver, CO 80206

CINEMA DETROIT
   4126 Third Street
   Detroit, MI 48201

              Plaintiffs,

              v.                    **JURY TRIAL DEMANDED**

SILVER CINEMAS ACQUISITION CO. D/B/A
LANDMARK THEATRES
   2222 South Barrington Avenue
   Los Angeles, CA 90064

2929 ENTERTAINMENT, LP
   3008 Taylor Street
   Dallas, TX 75226

              Defendants.

---

## COMPLAINT

Plaintiffs 2301 M Cinema LLC d/b/a West End Cinema, The Avalon Theatre Project, Inc., Denver Film Society, and Cinema Detroit bring this action against Defendants Silver Cinemas Acquisition Co. d/b/a Landmark Theatres and 2929 Entertainment, LP (jointly "Landmark") for violations of federal antitrust law and common law tortious interference with business relations and allege as follows:

## NATURE OF THIS ACTION

1.      Plaintiffs seek relief from Defendant Landmark's unlawful anticompetitive practice of coercing agreements from film distributors for exclusive rights to screen art, independent, foreign, and documentary films ("Specialty Films"), with the intent of injuring marketplace competition by excluding Plaintiffs' independent community movie theaters from screening the very same Specialty Films, thereby reducing output, increasing prices, and denying moviegoers the choice of theaters where they can see Specialty Films.

2.      Plaintiffs operate, and previously operated, independent community movie theaters ("independent theaters") located in the heart of metropolitan Washington, D.C.; Denver, Colorado; and Detroit, Michigan (hereinafter the "applicable markets"), with the mission of providing important exhibition spaces for consumers in each of those markets to enjoy Specialty Films. In addition to connecting their communities with the art of cinema, these independent theaters are an important, and often essential, source of competition in the applicable markets for viewing Specialty Films—providing more choices of locations and content for viewers and competing in the price of ticket sales.

3.      Landmark, a private corporation that forms part of a group of companies owned by venture capitalist Mark Cuban, is the admittedly dominant theater chain, or "circuit," that specializes in exhibiting Specialty Films in the United States, operating 51 theaters with 242 screens in 22 major metropolises, including theaters in each of the applicable markets.

4.      Plaintiffs bring this action against Landmark principally for violating the federal antitrust laws by engaging in unlawful anticompetitive conduct in connection with the screening of Specialty Films in the applicable markets (as it does in most other geographic markets in which it operates). Landmark has used, and continues to use, its sweeping nationwide "circuit"

power to coerce film distributors into granting it agreements that deny Plaintiffs and other independent theaters access to Specialty Films they wish to exhibit, either for the entire period, or for the lucrative initial period when a Landmark theater located in the applicable market exhibits the Specialty Film.

5.      To exhibit a film, a movie theater must obtain a license from the film's "distributor," which is responsible for marketing the film and acts as a middleman between the production studio and the exhibitor.

6.      Across the applicable markets—and, on information and belief, in most other geographic markets where Landmark screens Specialty Films—Landmark obtains from film distributors agreements known in the industry as "clearances," which block each of the Plaintiffs (and others) from obtaining licenses to screen desired Specialty Films to the public. The agreements obtained by Landmark require the distributor to agree that it will not license specified Specialty Films that the distributor would otherwise license to Plaintiffs during the entire time period Landmark is showing the film in one of its local theaters in the applicable market—"day and date," as it is called in the industry—or in some instances, just during the most lucrative initial time period that Landmark is showing the film. By wielding the market power that it has obtained with respect to Specialty Films through its operation of a nationwide "circuit" of theaters showing such films in 22 geographic markets, Landmark can demand that distributors "clear" independent theaters that could and would otherwise play the applicable Specialty Film in the applicable markets and other local markets throughout the United States.

7.      Landmark's abuse of its circuit-wide market power to obtain unjustified clearances is not only illegal—it is hypocritical. Just last year, Landmark itself filed suit against Regal Entertainment Group ("Regal"), another national theater chain, for engaging in the very

same anticompetitive conduct aimed at Landmark. Specifically, Landmark alleged that Regal leveraged its national circuit power in the market for screening mainstream "Commercial Films" to obtain clearances against a Landmark theater in Washington, DC—Atlantic Plumbing Cinema—that desired to play Commercial Films at that location. Amended Complaint, *Silver Cinemas Acquisition Co. DBA Landmark Theatres v. Regal Entm't Grp.*, No. 16-cv-00123-CRC (D.D.C. Feb. 24, 2016).[1] Just as Landmark sought relief from Regal's anticompetitive clearances with respect to Commercial Films (and succeeded), Plaintiffs seek relief from Landmark's exploitation of its circuit power to demand and obtain clearances from distributors against Plaintiffs for Specialty Films.

8.      Landmark's conduct violates Sections 1 and 2 of the Sherman Act because Landmark is leveraging its circuit-wide market power to squeeze Plaintiffs—smaller exhibitors that lack anywhere near the same reach and clout—out of screening popular Specialty Films in the applicable markets. Landmark's clearance practice reduces output and consumer choice; artificially inflates ticket prices; and facilitates its monopolization of the Specialty Film exhibition market in the applicable markets and in other geographic markets in which Landmark is already the dominant exhibitor of Specialty Films.

9.      Landmark's unlawful coercion is successful only because its business is essential to the success of most Specialty Films it exhibits. What is more, Landmark's conduct limits competition in the upstream market for Specialty Film distribution because it forces distributors to act against their own economic interests. In order to maintain their relationship with the

---

[1] Landmark reached a settlement with Regal whereby Regal agreed to cease clearing Landmark in Washington, DC. *See* Eriq Gardner, Regal Settles Monopoly Suit Led by Mark Cuban's Landmark Theatres, *Hollywood Reporter*, Aug. 24, 2016, http://www.hollywoodreporter.com/thr-esq/regal-settles-monopoly-suit-led-922636.

dominant exhibitor of Specialty Films, distributors must submit to Landmark's clearance demands instead of choosing the optimal combination of theaters to screen a Specialty Film in the applicable markets and in other geographic markets where Landmark operates theaters specializing in the exhibition of Specialty Films. In the downstream market for screening Specialty Films, Landmark's unlawful conduct reduces output, raises prices, and denies moviegoers the choice of theaters where they can see Specialty Films.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1367, and 15 U.S.C. §§ 4 and 15(a).

11.     The Court has personal jurisdiction over Defendants because each conducts substantial business in the District of Columbia.

12.     Venue is proper in this Court because a substantial part of the events giving rise to the claims alleged herein occurred in the District of Columbia, and because Defendant does business in the District of Columbia.

13.     Pursuant to Federal Rule of Civil Procedure 20(a), Plaintiffs may join in one action, because (A) they assert a right to relief with respect to and arising from the same occurrence, and (B) questions of law and fact common to all Plaintiffs will arise in this action.

## PARTIES

### Plaintiffs

14.     Plaintiff 2301 M Cinema LLC d/b/a West End Cinema ("West End Cinema") is a limited liability company organized under the laws of the District of Columbia with its principal place of business in the District of Columbia. For nearly five years, West End Cinema provided an attractive and convenient space for the public to view new Specialty Films, and was voted to

have the best popcorn in town. The West End Cinema operated as an independent community movie theater from 2010 until 2015, when Landmark's anticompetitive clearances forced it out of business. Shortly thereafter, Landmark leased the space in which West End Cinema had operated, and opened a Landmark theater in the same space to screen Specialty Films—despite the fact that Landmark already operated a nearby theater that also showed Specialty Films.

15.     Plaintiff The Avalon Theatre Project, Inc. ("Avalon") is a nonprofit, community-supported film and education center located at 5612 Connecticut Avenue in Washington, D.C. The oldest operating movie house in the market, the Avalon has been a cornerstone of Northwest Washington, D.C. since its opening in 1923. In 2001, a community group formed the nonprofit The Avalon Theatre Project, with the mission of acquiring, preserving, renovating, reviving, and expanding the Avalon. As a result of a remarkable grassroots effort, the historic theater was successfully restored and reopened in April 2003. It has two screens: the first, a historic 425-seat theater (one of the largest in Washington, D.C.), and the second, a 135-seat theater. The Avalon continues to invest in upgrading the two theaters, adding state of the art digital projection and sound, new HVAC systems, an elevator, and new seats, along with other infrastructure. In addition, the Avalon transformed its ticketing and concession area into a comfortable café serving not only the usual movie house fare, including great popcorn, but also gourmet coffees, premium ice cream, soft drinks, and alcoholic beverages, as desired by modern urban theater customers. The Avalon strives to offer exciting and diverse Specialty Film programming in a comfortable and accessible venue, including film festivals, a weekly Wednesday night series, special programs for families and seniors, and a film education program that has served over 8,000 Washington, D.C. public and charter school students since 2013.

16.     The Denver Film Society ("DFS") is a nonprofit organization located in Denver, Colorado that provides Specialty Film programming to the Denver community through year-round screenings, film festivals, and other special events. DFS operates a single theater in Denver, the Sie FilmCenter, which offers standard theatrical runs of domestic and international Specialty Films, as well as non-theatrical screenings through various program series and symposia. Opened by DFS in 2010, the Sie FilmCenter is a small, three-screen, state-of-the-art facility that features a spacious lounge, full-service bar, and premium concessions.  Its three screening rooms seat 40, 147, and 179, respectively, for a total seating capacity of 366. In addition, DFS produces several annual festivals, including the Denver Film Festival, and numerous genre-specific mini-festivals. DFS is the only nonprofit organization in Colorado dedicated to engaging both its members and the general public in a lifelong, life-altering relationship with and understanding of film and film culture.

17.     Plaintiff Cinema Detroit is a non-profit movie theater located in Detroit, Michigan. As Detroit's only seven-day-a-week truly independent movie theater, Cinema Detroit aims to deliver an eclectic, quirky, and quality mix of Specialty Films in the heart of the city. Founded in 2013 by two lifelong Detroiters and movie fans, Cinema Detroit's mission is to provide a community gathering place for watching Specialty Films and for the community dialogue that they spark.

## Defendants

18.     Defendant Silver Cinemas Acquisition Co. d/b/a Landmark Theatres is a corporation organized under the laws of Delaware with its principal place of business in Los Angeles, California. Defendant Landmark is a subsidiary of 2929 Entertainment, LP, and currently operates 51 Specialty Film theaters with 242 screens in 22 geographic markets

nationwide, including the applicable markets. Already the largest Specialty Film movie theater chain in the country by far, Landmark is aggressively expanding its market share with new theaters opening on a regular basis.

19.     Defendant 2929 Entertainment, LP ("2929") is a limited partnership organized under the laws of Texas with its principal place of business in Dallas, Texas. Defendant 2929 is the parent of Landmark, as well as several other media conglomerates. Both Landmark and 2929 are part of the Mark Cuban Companies group, which is controlled in large part by venture capitalist Mark Cuban.

## FACTUAL BACKGROUND

20.     Theatrical film exhibition is one of the most popular sources of entertainment in the United States.

21.     Movie theaters—known in the industry as film "exhibitors"—screen, or "exhibit," films to the public. Many movie theaters have multiple screens, which allow a film exhibitor to show more than one film at the same time. To be commercially viable, an exhibitor must have access to films that the public is interested in viewing, which are often the newest releases—known in the film industry as "first-run" films.

22.     In order to obtain films, exhibitors must negotiate for licenses from film "distributors," which are responsible for marketing and licensing films and act as an intermediary between production studios and exhibitors.

23.     "Commercial Films"—or mainstream films—are films licensed for exhibition widely to theaters all across the country, and are intended to appeal to the broadest audience possible. The three largest exhibitor chains—Regal, AMC, and Cinemark —dominate the market

for Commercial Films, in which Landmark does some business as a smaller chain for the showing of Commercial Films at select locations.

24.     By contrast, "Specialty Films," which include independent films, art films, foreign films, and documentaries, and is a term of art in the film industry, are released less widely than Commercial Films, and are not intended to appeal to as broad an audience. For example, Specialty Films typically appeal to older audiences than Commercial Films. Due to these differences, and as the U.S. Department of Justice ("DOJ") and Landmark itself have recognized, consumers do not regard Commercial Films as adequate substitutes for Specialty Films.

25.     As described earlier, a "clearance" is an exclusivity agreement between a distributor and an exhibitor by which a distributor agrees not to license a film to any other theater or to identified targeted theaters in the same geographic market. Clearances may be negotiated for the first few weeks a film is shown, which generally is the most lucrative screening period, or for the entire period a film is screened by an exhibitor (again, called "day and date" in the industry).

26.     Historically, the principal business justification for clearances was that the licensed exhibitor would pay for promotion and advertising of the film in its geographic market, and the clearance would prevent a competing exhibitor from "free riding" off of the licensed exhibitor's advertising expenditures and efforts. Today, however, such advertising expenditures and efforts are rare, because distributors have assumed sole responsibility for promoting their films and pay for nearly all the advertising costs, as Landmark concedes.

27.     In the past, clearances also were purportedly justified by the significant costs associated with producing and distributing films on celluloid reels. Distributors were able to

offset these costs by limiting the number of reels they created and using clearances to limit the number of theaters that could screen a film in a given area, thereby concentrating the viewing public to a few locations in a geographic market. Today, however, the overwhelming majority of films are distributed digitally, which has substantially reduced the cost of distributing films overall and likewise reduced the incremental cost of distributing each additional film copy. Exhibitors' projection equipment is now also digital. As a result, it is almost as simple for a theater to exhibit a high quality digital copy of a film as it is for a consumer to purchase and download a copy of a film at home. Accordingly, reducing distribution costs is no longer a justification for the use of clearances. In fact, distributors today have an economic incentive to feature a film in as many theaters and as many screens as possible—particularly in the lucrative first few weeks after initial release.

28. "Circuit deals" are agreements, either express or implied, through which a dominant movie theater chain, or "circuit," uses its market power to obtain preferential agreements, particularly clearances, from distributors for the licensing of films, expressly or effectively,  in multiple geographic markets, even though those agreements are not in the best economic interest of the distributors. While clearances may, under certain very limited circumstances, still be permitted for first-run films on a truly independent theater-by-theater, film-by-film basis, broader *circuit* deals have long been illegal under the antitrust laws. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 154-55 (1948).

29. Landmark is the dominant theater "circuit" for the exhibition of Specialty Films in the United States, maintaining monopoly power in most of the geographic areas where it operates because of its ability to provide a large number of theaters and screens to distributors for the release of Specialty Films in those geographic markets and nationwide. Distributors usually

accede to Landmark's exclusionary demands, even though it is against their economic interests. As a result, in the applicable markets, distributors have denied Plaintiffs access to *virtually every Specialty Film* for which Landmark has demanded a clearance against Plaintiffs. Distributors do so in order to avoid retribution from Landmark, as illustrated below, including in the form of a circuit-wide refusal by Landmark to show a particular or other Specialty Films—which could be ruinous to Specialty Film distributors.

30.     Instead of seeking specific and independent clearances of individual theaters with respect to individual first-run Specialty Films in competitive markets, Landmark has leveraged its dominant position nationwide to obtain what are effectively circuit deals under which distributors have granted Landmark clearances against Plaintiffs for virtually every Specialty Film Landmark wishes to show in the applicable markets. On information and belief, Landmark clears other independent theaters in the same manner in most of the other geographic markets in which Landmark shows Specialty Films. Distributors agree to Landmark's clearance demands because licenses with Landmark are essential to the commercial success of most of the Specialty Films they distribute. Landmark's circuit deal clearance practice has reduced output and consumer choice, thereby injuring competition in the applicable markets, as well as in other geographic markets where Landmark screens Specialty Films. In sum, through what is, in effect, a circuit-wide deal clearance practice, Landmark excludes competition and maintains monopoly power in the screening of Specialty Films in the applicable markets as well as in various other geographic markets, in violation of Sections 1 and 2 of the Sherman Act.

## RELEVANT MARKETS

### Product Market

31.     The relevant product market is the market for exhibiting first-run Specialty Films.

32.     Specialty Films cater to different audiences than Commercial Films. As noted in recent complaints by the DOJ, Specialty Films, characterized as independent films, art films, documentaries, and foreign-language films, have "more narrow appeal and typically attract an older audience than commercial movies." Complaint at para. 29, *United States v. AMC Entertainment Holdings, Inc.*, No. 16-cv-02475 (D.D.C. Dec. 20, 2016) [hereinafter Carmike Complaint]; Complaint at para. 16, *United States v. AMC Entm't Holdings, Inc.*, No. 15-cv-02181 (D.D.C. Dec. 15, 2015) [hereinafter AMC Complaint]. As further alleged by the DOJ, "[e]xhibitors consider the operation of theaters that exhibit art and foreign-language movies to be distinct from the operation of theaters that exhibit commercial movies." Carmike Complaint at para. 29; AMC Complaint at para. 16. And, as Landmark alleged in its own complaint against Regal, "movie-goers generally do not regard Specialty Films as adequate substitutes for Commercial Films." Amended Complaint at para. 31, *Landmark v. Regal*.

33.     While the clearances Landmark obtains for Specialty Films do not eliminate the possibility of screening every single Specialty Film (Landmark chooses only the most attractive Specialty Films to screen and clear), output is nevertheless decreased because the films left over in the applicable markets, and in most of the other geographic markets where Landmark operates, have considerably less appeal to consumers and generate considerably less attendance than the Specialty Films subject to the clearances obtained by Landmark. Moreover, Landmark's clearances deprive consumers of the choice of locations to view the more popular Specialty Films in the applicable markets and, on information and belief, in most other geographic markets where Landmark does business.

**Geographic Markets**

34.     The relevant geographic markets are each of the individual metropolitan geographic markets in which each Plaintiff operates or has operated: Washington, D.C.; Denver, Colorado; and Detroit, Michigan ("applicable markets").

35.     Landmark is the nation's largest Specialty Film theater chain. Landmark's circuit-wide market power with respect to the exhibition of Specialty Films derives from its operation of 51 theaters with 242 screens in 22 geographic markets: Albany, Atlanta, Baltimore, Boston, Chicago, Dallas, Denver, Detroit, Houston, Indianapolis, Los Angeles, Miami, Milwaukee, Minneapolis, New York City, Philadelphia, San Diego, San Francisco (including San Francisco, San Francisco East Bay, and San Francisco Peninsula), Santa Cruz, Seattle, St. Louis, and Washington, DC.[2]

36.     High barriers to entry reinforce Landmark's market power in the screening of Specialty Films. Attractive commercial real estate opportunities for theaters in major metropolitan markets are rare. Landmark's clearances serve as a further barrier to entry because investors have difficulty obtaining financing for theaters that would be affected by Landmark's clearances.

## UNLAWFUL ANTICOMPETITIVE CONDUCT AND EFFECTS

37.     Landmark is the dominant exhibitor of Specialty Films in the applicable markets and, on information and belief, in most of the other geographic markets where Landmark operates theaters that screen Specialty Films.

---

[2] *See* https://www.landmarktheaters.com/see-all-locations.

38.     Landmark's market power in the applicable markets and in most of the other geographic markets in which it operates is evident from the number of theaters and Specialty Film screens it controls chain-wide, and the fact that many distributors must yield to Landmark's clearance demands to be successful in the distribution of popular Specialty Films.

39.     Landmark has used its circuit-wide market power to compel distributors to deny Plaintiffs fair competitive access to popular Specialty Films, and to prevent Plaintiffs from earning the revenue needed to succeed.

### Washington, DC

40.     The Washington, DC market is geographically bounded by Interstate 495, also known as the "Beltway"—a ring road that borders the Washington, DC metropolis. Prior to 2015, Landmark operated two theaters in Washington, DC, controlling 14 of the 25 total Specialty Film screens, which amounted to 56% of the market for Specialty Film exhibition in Washington, DC.

41.     Consumers in the Washington, DC market generally do not travel outside of this area to attend a theatrical film screening. Given a small but substantial, non-transitory increase in the prices charged by Specialty Film exhibitors in the Washington, DC market (say, $1.00), consumers would not travel beyond the Washington, DC market to avoid the price increase because of the time and expense associated with traveling beyond the Washington, DC market; a lack of familiarity with neighborhoods beyond the Washington, DC market; and the difficulties and inconveniences associated with traveling beyond the Washington, DC market.

42.     Similarly, consumers outside of the Washington, DC market generally do not travel into the Washington, DC market to attend a theatrical film screening. Given a small but substantial, non-transitory increase in the prices charged by Specialty Film exhibitors in the

markets outside of the Washington, DC market, consumers outside of the Washington, DC

market would not travel into the Washington, DC market to avoid the price increase.

<u>Washington, D.C. Specialty Film Exhibitors: 2010-March 2015</u>



43.     Landmark's dominance in Specialty Films screens in Washington, DC, enabled it

to clear Plaintiff West End Cinema from either of Landmark's two local theaters at that time,

effectively prohibiting Plaintiff West End Cinema from showing any film Landmark booked at a

local Landmark theater during its entire run. Landmark's anticompetitive behavior of obtaining

clearances over the more popular Specialty Films ultimately drove Plaintiff West End Cinema out of business in 2015, a vivid demonstration of Landmark's ability to exclude competition in that market.

44.     The closure of Plaintiff West End Cinema cannot be explained by market conditions either. Demand for Specialty Films in Washington, DC has only increased in recent years. Indeed, less than a month after Plaintiff West End Cinema closed on March 29, 2015, Landmark leased the very same West End Cinema space and opened its own Landmark West End Cinema. Landmark's West End Cinema is now exhibiting Specialty Films as Plaintiff West End Cinema had done—without the hindrance of clearances from Landmark, of course— demonstrating that the Washington, DC market for Specialty Films could readily have included Plaintiff West End Cinema. Today, Landmark controls 17 of the 25 total Specialty Film screens in Washington, DC, or nearly 68% of the Washington, D.C. market for Specialty Film exhibition.

45.     In 2015, Landmark opened its Atlantic Plumbing Cinema in Washington, D.C. (in the Shaw/Howard University neighborhood), but that theater, with six screens, exhibits Commercial Films with very few exceptions, unlike most other Landmark theaters nationwide. Atlantic Plumbing is not a Specialty Film theater.

Washington, D.C. Specialty Film Exhibitors: October 2015-Present

Washington, D.C. Specialty Film Market Shares: Present



Specialty Film Exhibitor Screens: Washington, D.C.

- Landmark Theaters [17 Screens]
- Angelika Pop-up at Union Market [3 Screens]
- AFI Silver Theatre [3 Screens]
- The Avalon Theatre [2 Screens]

46.     Landmark continues to leverage its monopoly power in the Washington, DC market to aggressively clear independent theaters of Specialty Films, including in particular Plaintiff Avalon, which has been cleared by Landmark since 2003.

### *Denver*

47.     The Denver market is bordered to the south by U.S. Route 285, to the east by Interstate 225, to the north and west by Interstate 70. In Denver, Landmark controls 8 of 11 screens—a dominant 73% of the Specialty Film market.

48.     Consumers in the Denver market generally do not travel outside of this area to attend a theatrical film screening. Given a small but substantial, non-transitory increase in the prices charged by Specialty Film exhibitors in the Denver market (say, $1.00), consumers would not travel beyond the Denver market to avoid the price increase because of the time and expense associated with traveling beyond the Denver market; a lack of familiarity with neighborhoods

beyond the Denver market; and the difficulties and inconveniences associated with traveling beyond the Denver market.

49.     Similarly, consumers outside of the Denver market generally do not travel into the Denver market to attend a theatrical film screening. Given a small but substantial, non-transitory increase in the prices charged by Specialty Film exhibitors in the markets outside of the Denver market, consumers outside of the Denver market would not travel into the Denver market to avoid the price increase.

<u>Denver Specialty Film Exhibitors: Present</u>

50.     Plaintiff DFS, which operates three screens, is the only competitor of Landmark in the applicable market, although Landmark controls ***nearly three times more*** Specialty Film screens.



Denver Specialty Film Market Shares: Present



51.     Not satisfied with its 73% share of the Denver market, Landmark clears Plaintiff DFS for all Specialty Films shown at all local Landmark theaters in an attempt to thwart its only Specialty Film competitor, thereby allowing Landmark to obtain a complete monopoly.

52.     Landmark's clearance practices previously proved successful in eliminating competition in the Denver market.  In 2007, Neighborhood Flix Cinema & Café, a locally-owned for-profit independent theater with upscale amenities, opened after a $5 million investment in the space now owned by DFS.  Neighborhood Flix shuttered after just 10 months in operation because of its inability to compete with Landmark for first-run Specialty Films given Landmark's rampant clearances.[3] Thus far, the Sie FilmCenter has avoided the same fate, but only because DFS is a non-profit operation with additional revenue sources, such as grants and donations.

---

[3] *See* John More, *Neighborhood Flix to close its doors*, Denver Post, Sept. 23, 2008,
          http://www.5280.com/2008/09/help-keep-the-doors-open-at-neighborhood-flix/

*Detroit*

53.     The Detroit market is bounded by Twelve Mile Road to the north, Lake St. Clair

to the east, the Detroit River to the south, and the M-39 highway to the west. Landmark controls

3 of 5 screens showing Specialty Films, or 60% of the Detroit Specialty Film market.

54.     Consumers in the Detroit market generally do not travel outside of this area to

attend a theatrical film screening. Given a small but substantial, non-transitory increase in the

prices charged by Specialty Film exhibitors in the Detroit market (say, $1.00), consumers would

not travel beyond the Detroit market to avoid the price increase because of the time and expense

associated with traveling beyond the Detroit market; a lack of familiarity with neighborhoods

beyond the Detroit market; and the difficulties and inconveniences associated with traveling

beyond the Detroit market.

55.     Similarly, consumers outside of the Detroit market generally do not travel into the

Detroit market to attend a theatrical film screening. Given a small but substantial, non-transitory

increase in the prices charged by Specialty Film exhibitors in the markets outside of the Detroit

market, consumers outside of the Detroit market would not travel into the Detroit market to

avoid the price increase.

Detroit Specialty Film Exhibitors: Present



56.     Plaintiff Cinema Detroit is the only other exhibitor in the Detroit market that exhibits Specialty Films, with few exceptions.

Detroit Specialty Film Market Shares: Present



57.     In spite of Plaintiff Cinema Detroit's more central location, Landmark is able to leverage its circuit power to clear Cinema Detroit for nearly every Specialty Film shown at the local Landmark—which is located more than *eleven miles* from Cinema Detroit.

58.     Landmark's clearances of Plaintiffs are not justified by the proximity of its theaters to Plaintiffs' theaters. Furthermore, the high population density in the applicable markets can support several theaters playing Specialty Films, as evidenced by Landmark's multiple theaters in several of the applicable markets, and Landmark's decision to keep opening new theaters in these markets.

59.     On information and belief, Landmark engages in the same anticompetitive conduct in most of the other geographic markets in which it operates theaters. For example, in the Philadelphia market, Landmark controls 12 of 22 screens—a dominant 54% of the market for showing Specialty Films. The next largest competitor in the area operates four screens, one third as many as Landmark. On information and belief, Landmark leverages its national circuit power

to clear the independent theater—located nearly ***twenty miles*** from Landmark's local theaters—for the titles, durations, and locations Landmark chooses.

60.     Similarly, in St. Louis, Landmark controls nine of eleven Specialty Film screens—more than 80% of the market. Landmark dominates the St. Louis Specialty Film market, controlling more than four times as many screens as the next largest competitor, which operates only two screens showing Specialty Films. On information and belief, Landmark's national circuit power allows it to clear other Specialty Film exhibitors for the titles, durations, and locations it chooses.

61.     Likewise, in Houston, Landmark 3 of 5 screens showing Specialty Films, or 60% of the Specialty Film market. There are only two other Specialty Film exhibitors in the market, each of which operate only one screen—one third as many as Landmark. On information and belief, national circuit power allows it to clear other Specialty Film exhibitors for the titles, durations, and locations it chooses.

62.     San Francisco provides yet another illustration of Landmark's chain-wide dominance in the Specialty Film market. In that market, Landmark controls twelve of twenty-six Specialty Film screens, amounting to nearly half of the market for the showing of Specialty Films. The next largest competitor in San Francisco operates only four screens—one third as many as Landmark. On information and belief, Landmark's dominance in San Francisco has allowed it to clear independent theaters for virtually every Specialty Film shown at *any* of Landmark's three local theaters for the entire time period that any one of those Landmark theaters is exhibiting the applicable film.

## Illustrations of Landmark's Circuit Dealing

63.     Landmark's dominance is demonstrated by its ability to define the terms of clearances, including which titles to clear, the duration of the clearances, and which theaters to clear. In particular, Landmark has leveraged its national circuit power to bully distributors into clearing against each Plaintiff every Specialty Film Landmark wishes to clear, even though individual market conditions do not justify such clearances. Thus, distributors lose their ability to decide how widely to have a Specialty Film shown based on their economic interest and market conditions.

64.     Landmark, in practice, purports to obtain licenses on a film-by-film and theater-by-theater basis, but this fiction is an attempt to disguise its true project: blanket clearances against every Plaintiff for all of the Specialty Films Landmark chooses to show in each Plaintiff's market and, on information and belief, engaging in the same practice in most of the other markets where Landmark shows Specialty Films.

65.     Illustrations abound. For example, Plaintiff DFS recently was unable to show the Specialty Film "Moonlight" during its theatrical run due to Landmark's anticompetitive clearances. First, Landmark obtained a clearance for "Moonlight" against the Sie FilmCenter in favor of the Landmark Mayan theater, which is located a few miles from the Sie FilmCenter. After Landmark stopped showing "Moonlight" at its Mayan theater in late December 2016, Plaintiff DFS approached the distributor of the film to see if it would be possible to show the film at the Sie FilmCenter, as its audiences were eager to see the film, particularly during the holiday season. The distributor explained that it could not let the Sie FilmCenter show "Moonlight," because Landmark had now moved the film to the Landmark Chez Artiste—which is located nearly 6.5 miles from the Sie FilmCenter. Even when Plaintiff DFS explained that

Landmark was showing the film only once a day, whereas the Sie FilmCenter would offer multiple screenings per day, the distributor responded that it could not permit the Sie FilmCenter to show the film at the same time as Landmark. The distributor later reaffirmed this position when DFS sought to book the film after its Best Picture win at the Academy Awards. In response to this request, the distributor informed DFS that it was "not in a position to break precedent" by allowing the Sie FilmCenter to screen the film simultaneously with Landmark's Chez Artiste.

66.     Likewise, in May 2017, Plaintiff DFS reached out to a distributor to request booking for the Specialty Film "My Cousin Rachel." A representative for the distributor confirmed booking immediately, with a slated opening on June 9, 2017. Several days later, however, the representative informed DFS that it could no longer honor the booking because it had already confirmed opening the film with Landmark's Chez Artiste and, per the distributor's understanding, the Chez Artiste does not permit simultaneous screenings with the Sie FilmCenter.

67.     Similarly, Plaintiff Cinema Detroit was frequently cleared by the local Landmark theater (located more than eleven miles away), either for the entire time Landmark played a given film or altogether for all time. Recent examples include "Moonlight," "Hell or High Water," and "Birdman"—a litany of some of the most popular Specialty Films in the last few years; in each instance, Plaintiff Cinema Detroit was unable to show the film until two to four weeks after it was released, often when the local Landmark ended its exhibitions. Landmark's anticompetitive clearances further prevented Plaintiff Cinema Detroit from *ever* showing many recent Specialty Films, such as "Spotlight" and "Room." In the case of the film "Room," the distributor confirmed and subsequently canceled the booking with Cinema Detroit not once but

twice—each time after Plaintiff had published and promoted the film—due to Landmark's clearance demands.

68.     Local Landmark theaters also cleared Plaintiff West End Cinema (while it existed) for the entire time Landmark played a given film, and West End Cinema frequently learned of the clearance only days before the film opened. For example, in 2011, Plaintiff West End Cinema sought to license the Specialty Film "The Illusionist." The distributor refused to license the film to Plaintiff because Landmark had demanded an exclusive license for the film— not at its closest theater, which was located just 2 miles from the West End Cinema—but rather at another Landmark theater located 6.5 miles away from the West End Cinema. Landmark informed the distributor that it would not play the film if the distributor licensed "The Illusionist" to the West End Cinema. As a result, Plaintiff West End Cinema was denied the film. More recently, in 2014, Plaintiff West End Cinema was prevented from showing the Specialty Films "Anita" and "The Lunchbox" until *after* the local Landmark theaters had ended their exhibition of those films—three weeks or more after the films were released.

69.     As another example, in June 2016, Plaintiff Avalon was denied a license for "Love and Friendship" for the entire time the Specialty Film showed at the local Landmark theater. Plaintiff Avalon was similarly denied licenses for dozens of films between 2015 and the present due to Landmark's anticompetitive clearances, including recent Specialty Films "An Inconvenient Sequel" and "The Beguiled"—both of which Plaintiff Avalon was unable to show until the local Landmark theater ended its exhibition of the films.

70.     Another vivid example occurred in the Spring of 2017, when Plaintiff Avalon was licensed to exhibit the Specialty Film "Their Finest." Just prior to the scheduled opening at the Avalon, the distributor called to demand that the Avalon not show the film because Landmark,

which had opened the film the week before, sought a clearance while it showed the film at its local Bethesda Row theater. When Plaintiff Avalon refused to cancel, Landmark dropped the film—even though it was the highest grossing film at the multi-screen Bethesda Row theater at the time—as retribution against the distributor for failing to prevent Plaintiff Avalon from exhibiting the film at the same time.

71.     Landmark's message to the distributors is clear: if you license a Specialty Film to any one of the Plaintiffs when Landmark intends to exhibit that film, Landmark can and will use its national circuit power to retaliate against you by refusing to play that film or other films at various, if not all, of the 51 Landmark theaters in 22 major geographic markets throughout the country.

72.     Fearing retribution from Landmark in the form of a potential circuit-wide refusal to show a Specialty Film, and given the need of many distributors to do business with Landmark in order for potentially popular films to succeed, most distributors accede to Landmark's extortionary demands and deny Plaintiffs access to every Specialty Film Landmark requests on a "day and date" basis or for at least the first few weeks Landmark exhibits the film in that market.

### Anticompetitive Effects of Landmark's Circuit Dealing

73.     As these unjustified circuit dealings demonstrate, Landmark is not engaged in film-by-film, theater-to-theater competition. Rather, Landmark's clearances in each of the markets where Plaintiffs operate, and elsewhere, as set forth above, are anticompetitive in intent, design, and effect, and lack any pro-competitive justification.

74.     Landmark's clearance practices are not justified by the need to prevent Plaintiffs from "free riding" on film-specific advertising paid for by Landmark either, because distributors

now have virtually all of the responsibility for marketing their films. Landmark admits as much in its own litigation.

75.     Nor are Landmark's clearances justified by the need to limit costs associated with distributing Specialty Films, because digital film distribution (as opposed to distributing a film on a celluloid reel) has significantly reduced the cost of film distribution. Accordingly, no meaningful cost savings exist from a distribution perspective from limiting the number of theaters where a Specialty Film is playing. To the contrary, distributors are better off having their films exhibited in more theaters over the course of their first-run release to maximize revenue. In fact, distributors have informed Plaintiffs that the only reason they were refusing to license a particular Specialty Film was because of clearances demanded by Landmark, and not because they desired to restrict the number of theaters playing the film.

76.     Nor are Landmark's clearance demands justified by market conditions. In the few instances in which a Plaintiff has been able to obtain a license to exhibit a Specialty Film at the same time as a local Landmark, gross sales for the film have increased. And when Landmark has obtained a clearance, the distributor's overall revenue has decreased and fewer consumers have viewed the film.

77.     Therefore, barring Landmark's anticompetitive and monopolistic conduct, it would be in a distributor's economic interest to license Specialty Films to both Landmark theaters and Plaintiffs.

78.     Landmark's use of its dominance in the Specialty Film market in order to obtain clearances also has the effect of limiting movie patrons' theater choices. For many patrons, Plaintiffs provide a more desirable moviegoing experience than Landmark's theaters due to distance, convenience, and/or amenities. But Landmark's anticompetitive conduct forces patrons

to see Specialty Films at Landmark's theaters, rather than allowing patrons to choose between the local Landmark and local Plaintiff—or else generally not see most popular Specialty Films at all. In this way, Landmark's conduct deprives patrons of the freedom of choice regarding where to view Specialty Films or which Specialty Films they can see in their preferred theater.

79.     Landmark's demands for clearances have the effect of lowering overall Specialty Film exhibition output and quality. Some consumers are prevented from seeing popular Specialty Films at all because tickets sell out at the local Landmark theater and are not available at a Plaintiff's theater across town. And those who do buy a ticket at a Landmark's theater often pay a higher price for tickets and concessions and have to travel further (and pay for parking) due to the lack of competition.

80.     If Landmark did not leverage its circuit power, consumers would have the choice of viewing popular Specialty Films at Landmark's theaters as well as at Plaintiffs' theaters. In addition, Plaintiffs would serve as a competitive constraint on Landmark's Theaters, and Landmark's ticket and concession prices would decrease or, at a minimum, rise less rapidly.

81.     Moreover, because Plaintiffs are cleared by any or all local Landmark theaters, their choice of which films to exhibit is particularly limited, leaving them with very few options. Thus, Landmark's clearances have the anticompetitive effect of reducing consumer choice for popular Specialty Films. While Landmark's clearances make some Specialty Films available at Plaintiffs' theaters that would not otherwise be shown in one or more of the Plaintiffs' market, output is nevertheless reduced overall because the films left over for Plaintiffs to show are of limited popularity and attract considerably smaller audiences than the audiences that would attend the more popular films as to which Landmark demands and obtains clearances.

82.     Landmark leverages its circuit-wide power to obtain unjustified clearances against Plaintiffs in order to increase its revenues and further entrench its Specialty Film dominance. Plaintiffs, as well as distributors and consumers, have been and continue to be injured by Landmark's abuse of its dominant market position. Plaintiffs' damages are a result of Landmark's anticompetitive conduct, and include lost revenue from ticket sales, concessions, and merchandise, as well as injury to Plaintiffs' reputation as a result of the suffocating limitations Landmark's clearances place on their ability to offer popular Specialty Films.

## CAUSES OF ACTION

### COUNT I
### CIRCUIT DEALING: VIOLATION OF SHERMAN ACT SECTION 1

83.     Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

84.     As the largest Specialty Film theater circuit in the United States, Landmark possesses substantial circuit power.

85.     Landmark's policy and practice of threatening to use and using its circuit power to coerce distributors to agree to grant Landmark clearances against Plaintiffs substantially restrains competition in the applicable markets. Landmark's conduct in obtaining clearances against Plaintiffs for virtually every Specialty Film Landmark exhibits in every market where Plaintiffs do business, as well as clearances Landmark obtains against independent theaters in various other geographic markets, constitute circuit deals that violate well-established antitrust law. Landmark's anticompetitive conduct eliminates Plaintiffs' ability to obtain their choice of Specialty Films, and puts a premium on the size and reach of Landmark's nationwide circuit. The practice, therefore, constitutes a device for stifling competition in the exhibition of Specialty Films and diverting the cream of the Specialty Film business to Landmark.

86.     Landmark has engaged in the anticompetitive conduct described above with the intent of depriving, and does in fact deprive, Plaintiffs and other independent theaters of opportunities to distribute and exhibit the supply of Specialty Films needed for effective competition, and Landmark's conduct therefore unreasonably restrains trade and constitutes unlawful circuit dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

87.     Landmark's conduct has no procompetitive benefit or justification. Even if there were any possible procompetitive justifications, the anticompetitive effects of its conduct would outweigh any purported procompetitive justification.

88.     As a direct and proximate consequence of Landmark's unlawful conduct, Plaintiffs have been and continue to be injured in their business and property by being foreclosed from fair competitive access to Specialty Films. Plaintiffs have incurred damages in an amount to be proven at trial and to be automatically trebled, as provided in 15 U.S.C. § 15.

89.     Plaintiffs further seek equitable relief in the form of an injunction prohibiting Landmark from seeking clearances against Plaintiffs' theaters, as provided in 15 U.S.C. § 26. Plaintiffs will suffer irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins Landmark from its unlawful conduct and continuing violations of the antitrust laws.

90.     Plaintiffs are also entitled to recover from Landmark the costs of suit, including reasonable attorneys' fees, as provided in 15 U.S.C. § 15.

## COUNT II
## MONOPOLIZATION: VIOLATION OF SHERMAN ACT SECTION 2

91.     Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

92.     Landmark possesses monopoly power in the market for Specialty Film exhibition in each of the geographic markets in which it operates theaters in competition with Plaintiffs. Its monopoly power is evidenced by: (a) Landmark's dominant market share in each of Plaintiffs' geographic markets; (b) Landmark's national circuit power; (c) Landmark's control over distributors' licensing practices, because most distributors must agree to Landmark's clearance demands in order for many of the Specialty Films they distribute to be commercially successful; and (d) the high barriers to entry in the Specialty Film markets where Plaintiffs operate.

93.     Landmark has used its monopoly power in the Specialty Film market in the geographic markets in which it operates theaters in competition with Plaintiffs to coerce distributors into depriving Plaintiffs of the opportunity to compete fairly with Landmark for Specialty Film licenses and theater customers, thereby injuring competition.

94.     By such conduct, Landmark insulates itself from competition and excludes Plaintiffs from the licensing of popular Specialty Films, also injuring theater customers in the applicable markets, and thereby willfully maintaining and expanding its monopoly power in the applicable markets for Specialty Film exhibition.

95.     By its acts and practices, Landmark is engaging in a course of conduct that constitutes monopolization, i.e., the unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

96.     As a direct and proximate result of this unlawful conduct, Plaintiffs have been and continue to be injured in their business and property by being deprived of fair competitive access to Specialty Film licenses, in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

97.     Plaintiffs further seek equitable relief in the form of an injunction prohibiting Landmark from seeking clearances against Plaintiffs' theaters, as provided in 15 U.S.C. § 26. Plaintiffs will suffer irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins Landmark from its unlawful conduct and continuing violations of the antitrust laws.

98.     Plaintiffs are also entitled to recover from Landmark the costs of suit, including reasonable attorneys' fees, as provided in 15 U.S.C. § 15.

**COUNT III**
**ATTEMPTED MONOPOLIZATION: VIOLATION OF SHERMAN ACT SECTION 2**

99.     Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

100.     Through its dominant share of the Specialty Film market in the applicable markets, its national circuit power, and the anticompetitive conduct alleged above, even if such conduct is insufficient to provide Landmark with monopoly power, Landmark specifically intends through such conduct to obtain monopoly power for the showing of Specialty Film exhibition in the applicable markets. Moreover, in view of Landmark's dominant share of the markets for the exhibition of Specialty Films in most of the geographic markets in which it operates, its ability to exclude or foreclose competition and control distributors' Specialty Film licensing practices, and the high barriers to entry of independent theaters into those markets, Landmark's anticompetitive scheme injures competition and has a dangerously high probability of achieving a monopoly in the applicable markets for the exhibiting of Specialty Films.

101.     Landmark's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

102.    As a direct and proximate result of Landmark's unlawful conduct, Plaintiffs have been and continue to be injured in their business and property by being foreclosed from fair competitive access to the market for Specialty Film licenses, in an amount to be proven at trial and to be automatically trebled, as provided in 15 U.S.C. § 15.

103.    Plaintiffs further seek equitable relief in the form of an injunction prohibiting Landmark from seeking clearances against Plaintiffs' theaters, as provided in 15 U.S.C. § 26. Plaintiffs will suffer irreparable injury and loss of their business and property, for which there is no adequate remedy at law, unless the Court enjoins Landmark from its unlawful conduct and continuing violations of the antitrust laws.

104.    Plaintiffs are also entitled to recover from Landmark the costs of suit, including reasonable attorneys' fees, as provided in 15 U.S.C. § 15.

## COUNT IV
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

105.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

106.    Plaintiffs enjoy business relationships with their patrons. Plaintiffs derive economic benefit from those relationships through their ability to offer patrons a wide variety of Specialty Films. Landmark has actual knowledge of those relationships and their economic benefits to Plaintiffs.

107.    Plaintiffs enjoy business relationships with Specialty Film distributors that provide economic benefits to Plaintiffs through fair competitive access to those distributors' Specialty Films. Landmark has actual knowledge of those relationships and their economic benefits to Plaintiffs.

108.    Landmark has intentionally interfered with these relationships by coercing distributors not to enter into Specialty Film licensing agreements with Plaintiffs, depriving Plaintiffs of the ability to offer patrons those distributors' Specialty Films.

109.    Plaintiffs have been and continue to be injured as a direct and proximate result of Landmark's actions.

110.    Landmark's actions are not justified or privileged.

111.    Landmark has acted willfully, maliciously, oppressively, and with full knowledge of the adverse effects its actions would have on Plaintiffs, and with full and deliberate disregard for the consequences to Plaintiffs.

112.    Accordingly, Plaintiffs seek actual damages as well as exemplary and punitive damages in amounts to be proven at trial.

113.    Plaintiffs further seek equitable relief in the form of an injunction prohibiting Landmark from interfering with Plaintiffs' business relationships (1) with their patrons and (2) with Specialty Film distributors by seeking clearances against Plaintiffs' theaters.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

    a.  Monetary damages, including punitive damages;

    b.  A judgment for Plaintiffs against Landmark with respect to the federal antitrust claims set forth above for three times the amount of damages sustained by Plaintiffs, together with expenses of litigation and costs of this action, including reasonable attorneys' fees;

    c.  An injunction prohibiting Landmark from seeking clearances against Plaintiffs' theaters; and

    d.   Such other and further relief as the Court deems just and proper.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY.

Dated: September 27, 2017

                                   Respectfully submitted,

                                   */s/ Michael D. Hausfeld*

Irving Scher (*pro hac vice forthcoming*)    Michael D. Hausfeld (D.C. Bar No. 153742)
Hausfeld LLP                              Sathya S. Gosselin (D.C. Bar No. 989710)
33 Whitehall Street                   Michaela Spero (D.C. Bar No. 1047854 )
14th Floor                                    Hausfeld LLP
New York, NY 10004                 1700 K Street, NW
Phone: (646) 357-1100              Suite 650
ischer@hausfeld.com                 Washington, DC 20006
                                     Phone: (202) 540-7200
                                     mhausfeld@hausfeld.com
                                     sgosselin@hausfeld.com
                                     mspero@hausfeld.com

*Attorneys for 2301 M Cinema LLC D/B/A West End Cinema, Avalon Theatre Project, Inc.,*
*Denver Film Society D/B/A Sie Film Center, Cinema Detroit*

**CERTIFICATE OF SERVICE**

I certify that on September 27, 2017, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.


By:        */s/ Michael D. Hausfeld*
           Michael D. Hausfeld