**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 2301 M CINEMA LLC D/B/A/ WEST END CINEMA, et al.<br><br>                    Plaintiffs,<br>         v.<br><br>SILVER CINEMAS ACQUISITION CO. D/B/A LANDMARK THEATRES, et al.<br><br>                    Defendants. | Civil Action No. 1:17-cv-1990 (EGS) |

**LANDMARK DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Landmark Defendants respectfully move to dismiss this action brought by Plaintiffs West End Cinema, The Avalon Theatre Project, Inc., Denver Film Society, and Cinema Detroit with prejudice for failure of Plaintiffs' Complaint to state a claim upon which relief can be granted.  The legal and factual bases for this motion are set forth in the contemporaneously filed Memorandum of Points and Authorities in Support of Landmark's Motion to Dismiss.  Pursuant to Local Civil Rule 7(f), Landmark requests that the Court schedule an oral hearing on this motion.

DATED: December 15, 2017

Respectfully submitted,

**PERKINS COIE LLP**

By:/s/ Thomas L. Boeder
    Thomas L. Boeder, Pro Hac Vice
    TBoeder@perkinscoie.com
    Cori G. Moore, Pro Hac Vice
    CGMoore@perkinscoie.com
    Laura K. Hennessey, Pro Hac Vice
    LHennessey@perkinscoie.com
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    Telephone:  206.359.8000

By: /s/ Barry J. Reingold
    Barry J. Reingold, Bar No. 942086
    BReingold@perkinscoie.com
    700 Thirteenth Street NW, Suite 600
    Washington, D.C. 20005-3960
    Phone: 202.654.6200
    Fax: 202.654.6211

*Attorneys for Defendants Silver Cinemas*
*Acquisition Co. D/B/A Landmark Theatres, et*
*al.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 2301 M CINEMA LLC D/B/A/ WEST END CINEMA, et al. | |
| Plaintiffs, | Civil Action No. 1:17-cv-1990 (EGS) |
| v. | **ORAL ARGUMENT REQUESTED** |
| SILVER CINEMAS ACQUISITION CO. D/B/A LANDMARK THEATRES, et al. | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**LANDMARK DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF ARGUMENT ................................................................................ 1

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................................... 3

III.  ARGUMENT ............................................................................................................ 5

    A.  Standard for Dismissal ................................................................................ 5

    B.  Plaintiffs Fail to State a Plausible Claim of Circuit Dealing (Count I) ................. 6

        1.  No Facts Indicating Coercive Use of Nationwide Circuit Power ............. 6

        2.  No Concerted Action or Agreement ....................................................... 12

        3.  No Antitrust Injury to Competition or Consumers ................................. 15

    C.  Plaintiffs Fail to State a Plausible Claim of Monopolization (Count II) or Attempted Monopolization (Count III)............................................................. 18

        1.  No Leveraging Conduct........................................................................... 19

        2.  No Monopoly Power................................................................................ 20

    D.  Plaintiffs Fail to State a Plausible Claim for Tortious Interference (Count IV)............................................................................................................... 21

    E.  Defendant 2929 Entertainment, LP Should Be Dismissed ................................. 22

IV.  CONCLUSION........................................................................................................ 22

## TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................5, 6, 11, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)...............................................................................................15

*Cinema Village Cinemart, Inc. v. Regal Entertainment Grp.*,
2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016), *aff'd*, No. 16-3484, 2017 WL
4176223 (2d Cir. Sept. 21, 2017)..................................................................... passim

*City of Moundridge, KS v. Exxon Mobil Corp.*,
471 F. Supp. 2d 20 (D.D.C. 2007) .......................................................................19

*Cobb Theatres III, LLC v. AMC Entm't Holdings*,
101 F. Supp. 3d 1319 (N.D. Ga. 2015) .................................................................18

*Dial A Car, Inc. v. Transp., Inc.*,
884 F. Supp. 584 (D.D.C. 1995), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996) ...............5, 15

*Houser v. Fox Theatres Mgmt. Corp.*,
845 F.2d 1225 (3d Cir. 1988)...........................................................................11, 14

*In re Dig. Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................................22

*Mitchael v. Intracorp, Inc.*,
179 F.3d 847 (10th Cir. 1999) ...............................................................................21

*Onyeoziri v. Spivok*,
44 A.3d 279 (D.C. 2012) .......................................................................................21

*Orbo Theatre Corp. v. Loew's Inc.*,
156 F. Supp. 770 (D. D.C. 1957) ....................................................................10, 15

*Orson, Inc. v. Miramax Film Corp.*,
79 F.3d 1358 (3d Cir. 1996)...............................................................................14, 16

# TABLE OF AUTHORITIES

**Page**

*Reading Internat'l, Inc. v. Oaktree Capital Mgmt.LLC*,
 No. 03 Civ. 1895(PAC), 2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ....................10, 11, 14, 17

*Reading International, Inc. v. Oaktree Capital Management LLC*,
 317 F. Supp. 2d 301 (S.D.N.Y. 2003)...................................................................................11

*RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*,
 338 F. Supp. 2d 1208 (D. Colo. 2004)...................................................................................22

*Schine Chain Theatres v. United States*,
 334 U.S. 110 (1948).............................................................................................7, 19, 20

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
 No. 97 Civ.5499 (LAP), 2004 WL 691680 (S.D.N.Y. Mar. 31, 2004) ............................17, 20

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
 33 F. Supp. 3d 14 (D.D.C. 2014) .........................................................................................12

*Spectrum Sports, Inc. v. McQuillan*,
 506 U.S. 447 (1993)..............................................................................................................19

*Theee Movies of Tarzana v. Pac. Theatres, Inc.*,
 828 F.2d 1395 (9th Cir. 1987) .........................................................................................14, 16

*United States v. Griffith*,
 334 U.S. 100 (1948).............................................................................................7, 19, 20

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001)...........................................................................................16, 19

*\*United States v. Paramount Pictures*,
 334 U.S. 131 (1948)........................................................................................7, 10, 11, 15

## Statutes

15 U.S.C. § 1 ............................................................................................................ passim

15 U.S.C. § 2 ............................................................................................................ passim

## Other Authorities

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 3

## TABLE OF AUTHORITIES

**Page**

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF
ANTITRUST PRINCIPLES AND THEIR APPLICATION (3rd and 4th ed. 2010-2017)...............15, 19

The Landmark Defendants respectfully move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss this action for failure of Plaintiffs' Complaint to state a claim upon which relief can be granted.[1]

## I.      SUMMARY OF ARGUMENT

Defendant Silver Cinemas Acquisition Co. d/b/a Landmark Theatres ("Landmark") owns and operates 51 "specialty film" movie theaters in 22 cities across the country.  Over the past five decades, the Landmark brand has become synonymous with a quality, consistent, independent film viewing experience.  Plaintiffs are four non-profit and independent entities that operate (or operated) four "specialty film" movie theaters in three of the cities in which Landmark operates a competing theater:  Washington D.C., Denver and Detroit.

Plaintiffs in this antitrust action allege that Landmark is engaged in a scheme to leverage its national footprint to coerce unnamed film distributors to grant Landmark exclusive rights to show the most popular specialty films in the cities where Plaintiffs separately operate.  When Plaintiffs' rhetoric, legal conclusions and speculation are stripped away, however, Plaintiffs plead no facts adequate to support their antitrust claims.  Thus, the Complaint fails the requirements of Federal Rule of Civil Procedure ("Rule") 12(b)(6) and must be dismissed for several reasons.

First, the Complaint is devoid of any factual allegations supporting Plaintiffs' repeated assertion that Landmark engaged in "circuit dealing" in violation of Sections 1 and 2 of the Sherman Act.  Apart from vaguely outlining the legal elements of such a claim, Plaintiffs fail to allege who, what, when, where, or how Landmark leveraged its alleged nationwide circuit power in communications with any specifically named distributors over any particular film licenses in any of the three alleged geographic markets, let alone all of them.  Indeed, the allegations

---

[1] The "Landmark Defendants" refers collectively to Defendants Silver Cinemas Acquisition Co. d/b/a Landmark Theatres and its parent company 2929 Entertainment, LP.  "Plaintiffs" refers collectively to Plaintiffs 2301 M Cinema LLC d/b/a West End Cinema, The Avalon Theatre Project, Inc., Denver Film Society, and Cinema Detroit.

themselves suggest just the opposite, i.e., negotiations on a theater-by-theater, film-by-film, and city-by-city basis.

By way of example, Plaintiffs allege that in one instance in Washington D.C., Landmark "retaliated" by pulling a film from one of its theaters, the Bethesda Row, after it learned that the film's distributor had also licensed this same film to play at one of the Plaintiffs' theaters, the Avalon theater.  However, Plaintiffs' Complaint does not allege that Landmark pulled this film from any of its *other* 50 theaters (or threatened to do so), or that Landmark refused (or threatened) to not license *other* films from that same unnamed distributor.  This absence of factual support is found throughout the allegations in Plaintiffs' Complaint and is fatal to Plaintiffs' circuit dealing antitrust claims under the Sherman Act as well as Plaintiffs' common law claims that rely on the same theory.

Second, Plaintiffs' Section 1 claim fails for an even more basic reason—while proof of agreement is a fundamental element of any Section 1 antitrust claim, Plaintiffs fail to allege facts sufficient to plausibly suggest that Landmark entered into any *agreement* with any distributor at any time at all.  To the contrary, the facts that *are* alleged show only that Landmark competes for specialty film licenses on a theater-by-theater, film-by-film, and city-by-city basis—the approach to film licensing long endorsed by controlling Supreme Court case law in movie industry antitrust cases.  Indeed, the most that can be gleaned from Plaintiffs' allegations is that Landmark in some instances preferred to not show the same film as theaters located near its own in these three cities, and that unnamed distributors have agreed in certain situations to honor Landmark's preference.  Far from supporting an antitrust claim, these facts reveal a competitive market where distributors and exhibitors are unilaterally and rationally choosing the terms on which they do business with one another on a theater-by-theater, film-by-film, and city-by-city basis.

Plaintiffs' attempt to rely on the same fact-deficient allegations to support a Section 2 monopoly-leveraging claim likewise fails as the Complaint does not sufficiently plead facts to establish the required elements of a monopolization or an attempted monopolization claim.  And

finally, because Plaintiffs' common law tortious interference claim is based on identical allegations as the antitrust claims, it too must fall along with their antitrust claims. In the end, whether cast as circuit dealing under Section 1 of the Sherman Act, monopolization or attempted monopolization under Section 2, or common law tortious interference, Plaintiffs' claims fail to meet case law pleading standards under Rule 12(b)(6). Plaintiffs' case therefore should be dismissed with prejudice in its entirety.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   The Parties

Plaintiffs are four independent organizations that exhibit art, foreign, independent and documentary films (collectively, "Specialty Films") to the public. Complaint (ECF No. 1) ("Compl.") ¶¶ 14-17, 32. Three of the Plaintiffs are non-profits that, in addition to exhibiting Specialty Films, offer related film education, festivals and other programming. *Id.* ¶¶ 15-17. Plaintiff West End Cinema, located in Washington, D.C., operated independently for less than five years before closing its doors in 2015. *Id.* ¶ 14. Landmark subsequently leased the space and re-opened the West End Cinema. *Id.* The three non-profit Plaintiffs continue to operate and exhibit Specialty Films at their single theaters in Washington, D.C. (Avalon), Denver (DFS aka Sie FilmCenter), and Detroit (Cinema Detroit). *Id.* ¶¶ 15-17.

Since its founding in 1974, Landmark has grown into a successful motion picture exhibitor. Landmark focuses on Specialty Films, and operates 51 theaters in 22 different geographic markets dedicated to showcasing such films. *See id.* ¶ 18. Landmark also exhibits mainstream "Commercial Films" in several of its locations, *see id.* ¶¶ 23, 45, but, as Plaintiffs concede, the markets for Specialty Films and Commercial Films are distinct. *See id.* ¶¶ 24, 31, 32. Specialty Films appeal to a much narrower (and typically older) audience, are released less widely, and are not perceived by consumers or within the industry as adequate substitutes for Commercial Films. *Id.* ¶¶ 24, 31, 32.

**B.      The Film Distribution Process**

Movie theater "exhibitors" like Plaintiffs and Landmark must negotiate with film "distributors" to license the right to exhibit films at their movie theaters.  *Id.* ¶¶ 21-22.  These licensing agreements specify the terms under which the exhibitor can display the film, *see id.* ¶ 22, including the method of calculating the distributor's compensation.  Though the precise terms may vary, the income to a distributor—and thus the commercial success of any film—is directly pegged to the revenue earned by the exhibitor during its run of the film.  *See id.* ¶¶ 75-76.  Accordingly, distributors are incentivized to negotiate licenses with the particular theaters and on the particular terms they believe will maximize ticket sales for the film in question.

This dynamic leads to agreement on specific terms to accompany licenses for the exhibition of new releases (termed "first-run" films).  *See id.* ¶¶ 21, 25-27.  In some instances, particularly with respect to limited-audience Specialty Films, these terms may include an exclusive right for an exhibitor to show a new release within a given geographic area.  *See id.* ¶¶ 25, 28.  Such agreements to an exclusive term are often referred to within the industry as "clearances."  In particular situations, clearances can apply for a specified amount of time, such as the first few weeks of a film's exhibition (when ticket sales are likely to be highest) or may extend throughout the film's entire run with that theater.  *See id.*

Plaintiffs allege that unnamed distributors of Specialty Films have entered into clearance agreements with Landmark in the three geographic markets at issue in this case.  *Id.* ¶ 6.  They recognize, however, that clearance agreements negotiated on a film-by-film, theater-by-theater basis typically do not run afoul of the antitrust laws.  *Id.* ¶ 28.  Ignoring that distributors can be assumed to make voluntary, economically rational choices to offer clearances to Landmark, Plaintiffs contend that Landmark has *coerced* unnamed distributors to agree to clearances by using unlawful and anticompetitive tactics.  *Id.* ¶¶ 1, 4, 6.  Specifically, Plaintiffs contend that Landmark commits the antitrust offense of "circuit dealing" by leveraging its national footprint and success in *other* geographic markets across the country to force distributors to agree to

clearances in Washington, D.C., Detroit and Denver that are allegedly against the distributors' economic best interests.  *See id.* ¶¶ 6, 9, 28-30.

Based on these allegations, Plaintiffs filed their Complaint on September 27, 2017.  The Complaint asserts that Landmark committed circuit dealing in violation of Section 1 of the Sherman Act (Count I), and that this same conduct also constitutes monopolization (Count II) and attempted monopolization (Count III) under Section 2 of the Sherman Act, as well as the common law offense of tortious interference with business relations (Count IV).

## III.    ARGUMENT

### A.    Standard for Dismissal

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To establish facial plausibility, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Similarly, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (citation omitted).  Rather, plausibility requires the plaintiff to plead facts demonstrating "something beyond the mere possibility of [relief]."  *Twombly*, 550 U.S. at 557-58 (internal quotation marks and citation omitted).  Facts that, if true, are "merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

These requirements ring especially true in the antitrust context, where discovery is particularly time-consuming and expensive.  *See Twombly*, 550 U.S. at 558-59.  Thus, "a plaintiff must do more than simply paraphrase the language of the federal antitrust laws or state in conclusory terms that a defendant has violated those laws,"—just "dressing . . . up [the allegations] in the language of antitrust" does not suffice.  *Dial A Car, Inc. v. Transp., Inc.*, 884

F. Supp. 584, 588 (D.D.C. 1995), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996) (internal quotation marks omitted).  Plaintiffs' Complaint suffers from this flaw, and should be dismissed.

**B.      Plaintiffs Fail to State a Plausible Claim of Circuit Dealing (Count I)**

Plaintiffs' core claim—circuit dealing under Section 1 of the Sherman Act—reflects precisely the type of "threadbare recital[] of the elements of a cause of action" that the Supreme Court condemned in *Iqbal* and *Twombly*.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. It fails for three independent reasons.  First, the Complaint does not allege any facts to support Plaintiffs' claim that Landmark threatened to use or did use its nationwide circuit power to coerce distributors to grant clearances over Plaintiffs' theaters in the three designated markets. To the contrary, Plaintiffs' examples of supposed circuit dealing show that Landmark negotiates for licenses on a film-by-film and theater-by-theater basis.  Second, Plaintiffs' Section 1 claim fails because the Complaint does not include facts sufficient to plausibly suggest that Landmark even entered into any agreement with any distributor at all.  The most generous reading of Plaintiffs' allegations suggests only that in some instances Landmark has stated a preference to not show particular films that were to be simultaneously shown at nearby competing theaters, and that distributors—wanting to do business with Landmark—have honored this preference on specific occasions.  Third, the Complaint fails to allege facts sufficient to establish antitrust injury.  Although Plaintiffs complain that *their own businesses* have been harmed because they have not been able to show all of the films they desire when they desire, they do not posit any facts suggesting that *competition* or *consumers* have been injured by Landmark's conduct.

Plaintiffs' Section 1 circuit dealing claim therefore must be dismissed.

**1.      No Facts Indicating Coercive Use of Nationwide Circuit Power**

Antitrust jurisprudence has adopted a special breed of claim unique to the movie theater industry.  Termed "circuit dealing," the claim refers to an exhibitor's leveraging of its market power across its entire "circuit" of theaters in a variety of locations in negotiations with film distributors, giving the exhibitor a potential competitive advantage over its smaller competitors in each market.  As described by the Supreme Court cases that developed the claim, circuit

dealing is the "pooling of the purchasing power of an entire circuit in bidding for films," which "eliminate[s] the possibility of bidding for films theatre by theatre" and "prevents competitors from bidding for single features on their individual merits."  *United States v. Paramount Pictures*, 334 U.S. 131, 154-57 (1948).

A circuit dealing claim may be brought under either Section 1 or Section 2 of the Sherman Act and the requisite "pooling of purchasing power" can be shown through a variety of conduct.  For example, *Paramount Pictures* discussed "formula deals," where a licensing agreement is made between a distributor and an entire circuit of theaters and the distributor's revenue is pegged to the feature's ticket sales across that entire circuit; "master agreements," which are formula deals that cover exhibition in two or more theaters but not necessarily the entire circuit; and "block-booking," where the license agreement covers exhibition of two or more of a distributor's films at one theater.  *Id.* at 153-57.  Likewise, circuit dealing may occur where an exhibitor "combin[es] its closed and open towns in its negotiations for films," allowing the exhibitor to "dictate terms to the distributors."  *Schine Chain Theatres v. United States*, 334 U.S. 110, 115-16 (1948) (internal quotations omitted), *disapproved on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 778 (1984).  By "lump[ing] together towns in which [they have] no competition [(closed towns)] and towns in which there [are] competing theatres [(open towns)]," an exhibitor can obtain an advantage over its competitors in the license negotiation.  *United States v. Griffith*, 334 U.S. 100, 102-10 (1948), *disapproved on other grounds by Copperweld Corp.*, 467 U.S. at 778.  This advantage could be reflected in a formula deal, master agreement, or block-booking arrangement as described above, or it could be reflected in other terms like the pricing, duration, and exclusivity of the licensing agreement.  *See Schine Chain Theatres*, 334 U.S. at 115-16.

To state a claim for circuit dealing, however, a plaintiff must allege more than theater-by-theater, city-by-city negotiated clearance agreements on individual films.  *See Paramount Pictures*, 334 U.S. at 145 (recognizing that clearances that protect the interest of the exhibitor are reasonable "when not unduly extended as to area or duration").  This Plaintiffs fail to do.

Instead, the Complaint alleges generically—and without any specific *factual* support—that Landmark has a "practice of coercing agreements from film distributors for exclusive rights to . . . Specialty Films," Compl. ¶ 1, that is only successful because of the "market power it has obtained with respect to Specialty Films through its operation of a nationwide 'circuit' of theaters showing such films in 22 geographic markets." *Id.* ¶ 6; *see also id.* ¶¶ 30, 64, 85.

The Complaint fails to allege sufficient facts to plausibly suggest that circuit dealing occurred or to distinguish the film licensing practices relevant to this case as anything but reasonable business practices. There are no factual allegations concerning how Landmark wielded circuit-wide power, with what distributors, and in what factual circumstances. Instead, Plaintiffs ask the Court simply to assume that because of the size of Landmark's circuit, circuit dealing *must have* occurred. But *Twombly* prohibits the Court from so assuming. 550 U.S. at 570. Plaintiffs at the pleading phase have the burden of establishing through specific factual allegations that circuit dealing is a plausible explanation for the clearances at issue. They have failed to do so.

While Plaintiffs state that "[i]llustrations abound" of Landmark's circuit-wielding behavior, *none* of the Complaint's few examples allege facts suggesting either that Landmark used any nationwide circuit power during negotiations with distributors or that those negotiations resulted in "blanket" clearance agreements applicable to more than one of Landmark's theaters or more than one of any particular distributor's films. *See* Compl. ¶¶ 63-72. To the contrary, the select "illustrations" outlined in the Complaint are consistent with only one plausible inference—i.e., that Landmark's theaters in Denver, Washington D.C., and Detroit licensed clearances for particular Specialty Films on a theater-by-theater, film-by-film basis.

In Denver, for example, Plaintiffs allege that DFS "was unable to show" the film "Moonlight," *id.* ¶ 65, because the distributor had granted Landmark's Mayan theater the exclusive rights to exhibit that film in the Denver area during the film's lucrative first-run, and then, once the first-run had ended, the distributor granted another Landmark theater in the area (the Chez Artiste) the exclusive right to exhibit "Moonlight" for its second-run. *Id.* The

distributor allegedly explained that it could not allow Plaintiff to exhibit the film at the same time as another Landmark theater in the area.  *See id.*  Plaintiffs make similar allegations for the film "My Cousin Rachel."  *Id.* ¶ 66.  But Plaintiffs' Complaint contains no factual allegations suggesting that Landmark's showing of "Moonlight" or "My Cousin Rachel" at its Denver area theaters was the result of anything other than theater-by-theater, film-by-film negotiations with the distributor.  The Complaint contains no factual allegations that Landmark coerced the distributors of these films in any way to grant Landmark exclusive rights in Denver by threatening not to license those films (or any others) at Landmark's non-Denver theaters.

Similarly, in Washington D.C., Plaintiff West End Cinema alleges that it was unable to exhibit the film "The Illusionist" because a Landmark theater in the area told the distributor that it would only play the film if the distributor agreed to offer Landmark an exclusive license.  *See id.* ¶ 68.  Plaintiff West End Cinema admits that it did negotiate licenses to show two other films—"Anita" and "The Lunchbox" —but only after the Landmark theaters had completed their exhibition of those films.  *Id.*  Plaintiff Avalon alleges that it was unable to exhibit "Love and Friendship," "An Inconvenient Sequel," and "The Beguiled" until after the films completed their run at Landmark's D.C. theaters.  *Id.* ¶ 69.

The clearances at issue in these instances, however, relate only to particular films in specific Washington, D.C. theaters.  There are no factual allegations to support a claim that Landmark coerced distributors to grant exclusive rights by threatening not to license those films (or any other films) at Landmark's non-Washington, D.C. theaters.  And none of these "illustrations" relating to Washington, D.C. area theaters alleges any facts to plausibly suggest coercion through circuit dealing.  Plaintiffs similarly allege that Landmark pulled a film from its local theater (the Bethesda Row) after learning that the distributor had also licensed it to the Avalon.  *Id.* ¶ 70.  However, once more, Plaintiffs offer no factual allegations to support a contention that Landmark engaged in circuit dealing, for example by pulling that distributor's film from any of its other 50 theaters (or threatening to do so), or by refusing (or threatening) to not license other films from that distributor.

Likewise, in Detroit, Plaintiff Cinema Detroit alleges that it was unable to show "Moonlight," "Hell or High Water," and "Birdman" until after the local Landmark theater ended its exhibitions, and that it was unable to show "Spotlight" and "Room" at all. *Id.* ¶ 67.

Taking these facts as true, the very most they show is that Landmark's theaters in Denver, Washington, D.C., and Detroit licensed several Specialty Films on a theater-by-theater, film-by-film, and city-by-city basis; that Landmark in those instances preferred that competing theaters within geographic proximity not exhibit films simultaneously with Landmark's theater; and that Landmark conveyed this preference to distributors. All of this represents a rational business practice for a Specialty Film exhibitor like Landmark. As Plaintiffs themselves allege, Specialty Film markets are inherently different from Commercial Film markets because of the limited audiences for Specialty Films—thereby highlighting the reasonable business justification for Specialty Film theaters to decline to play a film that is simultaneously licensed to play at a nearby theater, diluting the already limited audience and ticket-sales potential.

And it is equally rational for Specialty Film distributors to honor such requests from a reliable, long-standing successful exhibitor. "[A] person engaged in the manufacture or sale of goods, or in rendering services, is under no obligation to sell to everyone who applies, or to serve everyone who desires to deal with him." *Orbo Theatre Corp. v. Loew's Inc.*, 156 F. Supp. 770, 779 (D.D.C. 1957) (dismissing Sherman Act section 1 challenge to clearance practice after bench trial), *aff'd*, 261 F.2d 380 (D.C. Cir. 1958). Indeed, "*Paramount* did not condemn the existence of national relationships between theatres and distributors, as such relationships are inevitable; Paramount merely condemned using these national relationships to leverage master licensing agreements nationwide." *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC ("Reading II")*, No. 03 Civ. 1895(PAC), 2007 WL 39301, at *8 (S.D.N.Y. Jan. 8, 2007).

Plaintiffs' allegations lack any factual predicate to suggest that Landmark is *using* claimed circuit-wide market power in its negotiations with distributors *in* these three particular markets *for* these (or any other) particular films. Indeed, Plaintiffs' allegations do not even support a plausible inference that Landmark and distributors agreed to clearances that covered all

of Landmark's theaters or more than one film at a time.  Nor are there facts alleged in the Complaint that suggest that Landmark has threatened distributors, or that distributors "[f]ear[] retribution" from Landmark.  *See* Compl. ¶ 72.

Moreover, each of the Complaint's "Illustrations of Landmark's Circuit Dealing" is no more than an illustration of the type of individual negotiation that the Supreme Court has expressly condoned under the rubric of requiring film licensing decisions to be made on an individual, theater-by-theater, and film-by-film basis.  *See Paramount Pictures*, 334 U.S. at 154 (finding formula deals and master agreements violate antitrust law because they "eliminate the possibility of bidding for films theatre by theatre" and thereby "eliminate the opportunity for the small competitor to obtain the choice first runs").

All Plaintiffs are left with to support their antitrust claims is the allegation that Landmark operates a nationwide circuit of 51 theaters in 22 geographic markets, and that in some of those markets—including the markets in which Plaintiffs operate—Landmark is the largest Specialty Film exhibitor in town.  *See, e.g.*, Compl. ¶¶ 40 (Washington, D.C.), 47 (Denver), 53 (Detroit), 59 (Philadelphia), 60 (St. Louis), 61 (Houston), 62 (San Francisco).  Yet, the mere fact that Landmark is the most successful Specialty Film exhibitor in these towns is not enough to plausibly support Plaintiffs' contentions of antitrust violations—most of which are made on mere "information and belief"—that Landmark *uses* its alleged nationwide dominance to extract circuit-wide clearances from distributors.  *See, e.g.*, *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1233 (3d Cir. 1988) (rejecting circuit dealing claim where plaintiffs "have not presented any evidence that [defendant] used circuit power to coerce any of the distributor defendants in their licensing decisions"); *Reading II*, 2007 WL 39301, at *6-10 (granting summary judgment dismissal of circuit dealing claim); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC ("Reading I")*, 317 F. Supp. 2d 301, 318 n.9 (S.D.N.Y. 2003) (granting in part defendants' motion to dismiss, including dismissal of circuit dealing claim).  Although Landmark's allegedly high market share in the geographic markets Plaintiffs cite may not be *inconsistent* with the Complaint's circuit-dealing contentions, that market share alone is far from

enough *plausibly to* suggest that Landmark in fact so acted.  *See Iqbal*, 556 U.S. at 678-79;

*Twombly*, 550 U.S. at 556-57.

The absence of any factual allegations that plausibly suggest that Landmark has used any

nationwide circuit power to coerce distributors is fatal to Plaintiffs' circuit dealing claim.

### 2.     No Concerted Action or Agreement

Plaintiffs' circuit dealing claim fails for the additional reason that it does not satisfy the

most basic pleading requirement of a Sherman Act Section 1 claim—facts permitting a plausible

inference of concerted action or an agreement.  Section 1 of the Sherman Act prohibits "[e]very

contract, combination …, or conspiracy, in restraint of trade or commerce among the several

States."  15 U.S.C. § 1.  Because this language has been interpreted to condemn only

"unreasonable" contracts, combinations and conspiracies, the "crucial question is whether the

challenged anticompetitive conduct stems from independent decision or from an agreement, tacit

or express."  *Twombly*, 550 U.S. at 553 (internal quotation marks and citation omitted).  Pleading

any violation of Section 1, therefore, requires "allegations plausibly suggesting (not merely

consistent with) agreement."  *Id.* at 557-59.  In other words, a plaintiff "must plead a factual

context sufficient to support a plausible inference that an agreement . . . did, in fact, exist."  *Sky

Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 33 F. Supp. 3d 14, 20 (D.D.C. 2014).  The

Supreme Court established and elaborated on this requirement of Section 1 claims in *Twombly*,

where it explained:

> A statement of parallel conduct, even conduct consciously
> undertaken, needs some setting suggesting the agreement
> necessary to make out a § 1 claim; without that further
> circumstance pointing toward a meeting of the minds, an account
> of a defendant's commercial efforts stays in neutral territory.  An
> allegation of parallel conduct is thus much like a naked assertion of
> conspiracy in a § 1 complaint: it gets the complaint close to stating
> a claim, but without some further factual enhancement it stops
> short of the line between possibility and plausibility of
> "entitle[ment] to relief."

550 U.S. at 557 (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st

Cir. 1999)).

Plaintiffs who bring Section 1 challenges in the movie theater industry must meet this pleading requirement and assert sufficient facts to plausibly suggest concerted action or agreement.  For example, in *Cinema Village Cinemart, Inc. v. Regal Entertainment Grp.*, the court granted Regal's motion to dismiss the plaintiff's Section 1 challenge.  No. 15-cv-05488 (RJS), 2016 WL 5719790, at *1 (S.D.N.Y. Sept. 29, 2016), *aff'd*, No. 16-3484, 2017 WL 4176223, at *1 (2d Cir. Sept. 21, 2017).  There, the plaintiff movie theater Cinema Village Cinemart (CVC) asserted its difficulties in obtaining licenses for first-run films were caused by clearance agreements between distributors and Regal, which the plaintiff contended Regal "extracted" from the distributors "against their economic interests, by using its considerable market power as a major nationwide theater chain."  *Id.*  Finding that "[n]one of CVC's allegations . . . plausibly suggests the existence of" the unlawful clearance agreements discussed in the complaint, the court granted Regal's motion to dismiss, *id.* at *2-4, reasoning that "the simple fact that various film distributors have chosen to deal with Regal and not CVC is . . . clearly not enough to establish the first element of a Section 1 claim."  *Id.* at *3.

The facts of the *Cinema Village Cinemart* case map perfectly to those of Plaintiffs here.  Like CVC, Plaintiffs rely exclusively on recounting instances when individual plaintiff theaters have been turned down for film licenses from various (in this case unnamed) distributors.  *See* Compl. ¶¶ 65-70.  Likewise, Plaintiffs here support their allegations with "vague and unattributed" assertions that some of these distributors indicated that Landmark's desire to showcase the film exclusively at a competing Landmark theater was the motivating factor in the distributor's decision.  *See id.*; *Cinema Village Cinemart*, 2016 WL 5719790, at *3.  Such allegations were held not enough to plausibly suggest an agreement between Regal and distributors in *Cinema Village Cinemart*, and they are not enough to plausibly suggest an agreement between Landmark and unnamed distributors here.  Likewise, like CVC, Plaintiffs' effort to substantiate their claims by pointing to Landmark's nationwide market power is no help—just because Landmark might possess market power does not mean that Landmark in fact leveraged that market power in its negotiations.  *See id.*  Like Regal, Landmark "could have

made the unremarkable business decision to devote its screens to films that do not play simultaneously at a nearby theater." *Id.*

Nor does a distributor's decision to respect Landmark's stated preference go against the distributor's economic interests. It should come as no surprise that, based on reasonable and independent business considerations, distributors might choose to do business with a successful, for-profit theater operator rather than with a competing non-profit community theater operator. Because distributors' revenue is directly linked to the number of tickets sold, distributors' success depends on exhibitors' ability to attract the public to view their films. *See, e.g.*, *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1362 (3d Cir. 1996) ("Typically, the license provides that the distributor will receive a minimum percentage of the exhibiting theater's box office gross. A film distributor's revenues, therefore, depend directly upon a theater's capacity to attract the public."); *Houser*, 845 F.2d at 1232 ("[T]he decision to license a picture to one theater rather than another is based on a complicated subjective estimation of a theater's grossing potential."); *Theee Movies of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1399 (9th Cir. 1987) ("[D]istributors had a legitimate business interest in the revenue generated by the theaters they licensed, because the distributors were paid, in part, out of each movie's gross profits."). "Thus, the decision to license a movie to one theater or another is premised in considerable measure on a distributor's assessment of a theater's grossing ability." *Orson*, 79 F.3d at 1362. Plaintiffs do not (and cannot) allege that their individual theaters have larger grossing abilities than the local Landmark theaters in their areas. To the contrary, Plaintiffs admit that Landmark's business "is essential to the success of most of the Specialty Films it exhibits," likely for the very reason that the Landmark brand is so successful at attracting the public and selling tickets for films that by definition appeal to a limited audience. *See* Compl. ¶ 9.

Accordingly, the facts pled in Plaintiffs' Complaint are at best equally likely to indicate unilateral decision-making as to support any contention of unlawful circuit dealing. This includes Landmark's preference for showcasing first-run films that are not simultaneously showing at a nearby competitor theater, and distributors' "sound business judgment" to honor

that preference, betting that Landmark "would generate more profits for them, and sooner, than would" Plaintiffs' primarily non-profit theaters. *See Theee Movies of Tarzana*, 828 F.2d at 1400. Plaintiffs' contention to the contrary—that the distributors would generate more money by playing their film at as many theaters as possible—not only ignores Landmark's right to state the terms under which it is willing to play particular films in certain Landmark theaters, it is also not based on any factual information or explanation of market conditions. *See Reading II*, 2007 WL 39301, at *16 (noting that plaintiff's argument that distributors "could make more money playing movies if [plaintiff] were allowed to play day and date with [defendant]" is "wholly speculative").[2]

### 3. No Antitrust Injury to Competition or Consumers

Finally, Plaintiffs' Section 1 claim, as well as their Section 2 claim, also fails for want of antitrust injury. It is axiomatic that "[t]he antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quotations and citation omitted). Accordingly, to state an antitrust claim, a plaintiff must plead facts "'showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market.'" *Cinema Village Cinemart*, 2016 WL 5719790, at *4 (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)). Termed "antitrust injury," courts require plaintiffs to allege and ultimately prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. Thus, Plaintiffs must do more than assert merely that their individual theaters have been harmed by Landmark's conduct; they must

---

[2] Nor can Plaintiffs' wiggle out of this by arguing that, instead of asserting a broader circuit dealing claim, they are in fact merely challenging the reasonableness of the alleged clearances. Even assuming Plaintiffs have pled sufficient facts to plausibly allege the existence of clearance agreements (which they have not), Plaintiffs' complaint contains no facts explaining how such clearance agreements are "unduly extended as to area or duration" as recognized by the Supreme Court. *United States v. Paramount Pictures*, 66 F. Supp. 323, 341 (S.D.N.Y. 1946), *aff'd in part, rev'd in part*, 334 U.S. 131, 145 (1948). As this Court has recognized, "reasonable clearance[s] . . . have been upheld in numerous cases," and so Plaintiffs must do more than assert their existence to challenge their reasonability. *See Orbo Theatre Corp.*, 156 F. Supp. at 778.

assert facts suggesting injury to competition at large, and this they have failed to do.  "'[A]bsent injury to *competition*, injury to plaintiff as a *competitor* will not satisfy th[e] pleading requirement.'"  *Dial A Car*, 884 F. Supp. at 589 (quoting *Mizlou Television Network, Inc. v. Nat'l Broad. Co.*, 603 F. Supp. 677, 683 (D.D.C. 1984).[3]  Paying lip service to this antitrust injury mantra, Plaintiffs offer three reasons the conduct of which they complain impacts consumers and competition itself.  But each of these rationales falls flat, and reveals Plaintiffs' pure self-interested motivation.

First, Plaintiffs contend that the output of films made available to the public has decreased because of Landmark's conduct.  *See, e.g.*, Compl. ¶¶ 33, 79, 81.  The factual allegations, however, show just the opposite.  As Plaintiffs admit, interbrand competition between distributors of different Specialty Films has actually increased because "Landmark's clearances make some Specialty Films available at Plaintiffs' theaters that would not otherwise be shown in one or more of the Plaintiffs' market[s]." *Id.* ¶ 81.  Courts routinely recognize this influx of variety into the film market to be a procompetitive benefit of the clearance practice. *See, e.g.*, *Theee Movies of Tarzana*, 828 F.2d at 1399 (clearance "encouraged interbrand competition by forcing [exhibitor] to find alternative subrun movies"); *Orson*, 79 F.3d at 1372 (clearance "undeniably promoted interbrand competition").  As alleged, the use of these clearances has increased, not decreased, market output.

Ignoring this, Plaintiffs speculate that output has decreased because "[s]ome customers" are unable to see the film they want to see because "tickets sell out at the local Landmark theater

---

[3] The antitrust injury requirement applies equally to claims brought under Section 1 and Section 2 of the Sherman Act.  *See generally* AREEDA & HOVENKAMP, *supra* ¶ 337.  Though most faithfully discussed as an independent standing doctrine, courts often subsume the antitrust injury analysis within the substantive elements of the claim.  Thus, antitrust injury concerns often inform courts' assessment of whether a restraint of trade is deemed unreasonable under Section 1.  *E.g.*, *Cinema Village Cinemart*, 2016 WL 5719790, at *4-6.  Likewise, whether conduct qualifies as exclusionary under Section 2 depends on whether it harms "the competitive *process* and thereby harm[s] consumers…harm to one or more *competitors* will not suffice." *United States v. Microsoft Corp.,* 253 F.3d 34, 58 (D.C. Cir. 2001).  Plaintiffs' failure to plead antitrust injury is therefore an independent basis for dismissing *both* their Section 1 circuit dealing claim as well as their Section 2 monopolization and attempted monopolization claims.

and are not available at a Plaintiff's theater across town." Compl. ¶ 79.  Focusing only on sold-out shows at a particular time of the day, Plaintiffs make "no attempt to allege facts showing that consumer demand in [the applicable markets] exceeds the . . . supply" of total viewing times provided by Landmark.  *Cinema Village Cinemart*, 2016 WL 5719790, at *5.  This type of "wholly conclusory" language was not enough for the *Cinema Village Cinemart* court, nor is it enough here.  *Id.*  Though Plaintiffs need not, at this stage, *prove* that output has been reduced, they do need to "allege facts showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market."  *Id.* at *4 (quotations and citation omitted); *see also Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  This they have not done.

Plaintiffs similarly speculate that Landmark's conduct "artificially inflates ticket prices." Compl. ¶ 8.  The Complaint, however, lacks any facts to plausibly suggest that this is true. Instead, Plaintiffs rely solely on the theoretical argument that a "lack of competition" for showcasing individual films would "often" lead to customers paying "a higher price for tickets and concessions."  *Id.* ¶ 79.  Plaintiffs simply assume, without citing any supporting facts, that if they could showcase the same films as Landmark, "Landmark's ticket and concession prices would decrease or, at a minimum, rise less rapidly."  *Id.* ¶ 80.  Yet the Complaint says *nothing* about what Landmark's ticket and concession prices actually are, whether they have risen over time, or how Landmark's prices have compared to those charged by Plaintiffs.  Plaintiffs must assert *some* facts to ground their price assertion in reality.  Because Plaintiffs allege "no facts to suggest that ticket prices would be lower and discounts more generous if [Landmark's and Plaintiffs' theaters] played the same first-run films at the same time," Plaintiffs have failed to adequately assert an impact on price.  *Cinema Village Cinemart*, 2016 WL 571970, at *5.

Finally, Plaintiffs assert that customer choice is reduced because Landmark's and Plaintiffs' theaters do not show the same films.  *See, e.g.*, Compl. ¶¶ 33, 81.  Yet "the mere fact that a consumer who might, for example, prefer to watch a film at [a Plaintiff's theater] has to instead go to another nearby theatre to see that film does not mean that there has been an

actionable harm to consumer choice or competition." *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ.5499 (LAP), 2004 WL 691680, at *10 (S.D.N.Y. Mar. 31, 2004); *see also Cinema Village Cinemart*, 2016 WL 5719790, at *5 (holding that "without more," the fact that "consumers must watch first-run films at one theater rather than at another" is insufficient to establish actionable antitrust harm to competition); *Reading II*, 2007 WL 39301, at *16 ("forcing a moviegoer to see a film at his second choice location is also not the concern of the antitrust laws").

To state an actionable harm to consumer choice, Plaintiffs must explain what is significant from a moviegoer's perspective about the difference between Plaintiffs' and Landmark's theaters. Yet the Complaint alleges nothing to suggest differences in the quality of the moviegoer's viewing experiences at those competing theaters, likely because Plaintiffs know that Landmark provides a superior viewing experience. *Cf.*, *Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1335 (N.D. Ga. 2015) (denying motion to dismiss, finding Plaintiffs had "alleged *more* than a mere substitution of competitors" in that "consumers are being forced to purchase a product that is less desirable and of inferior quality").

In sum, Plaintiffs utterly fail to allege any facts that would plausibly suggest that Landmark's conduct has had an anticompetitive effect on consumers and competition in the Specialty Films market. Plaintiffs believe that they themselves have been injured because they have not been able to showcase all the films they would have liked to show at the time they would have liked to show them. Because injury to individual competitors is not the concern of antitrust law, however, Plaintiffs fail to assert that Landmark's conduct caused antitrust injury to competition or consumers.

## C.   Plaintiffs Fail to State a Plausible Claim of Monopolization (Count II) or Attempted Monopolization (Count III)

In an effort to extract more mileage out of their flawed circuit-dealing hypothesis, Plaintiffs next allege that the same speculative and factually unsupported allegations establish claims for monopolization (Count II) and attempted monopolization (Count III) under Section 2

- 18 -

of the Sherman Act.  But just as Plaintiffs' speculative and conclusory assertions of circuit-wide coercion fail to plausibly suggest the concerted action required for their Section 1 claim, so too do these allegations fail to establish either the requisite exclusionary conduct under Section 2 or that Landmark has monopoly power.  Dismissal of the Section 2 claims is likewise required.

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize."  15 U.S.C. § 2.  "To plead a colorable Section 2 claim for actual monopolization, a plaintiff must make factual allegations showing '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'"  *City of Moundridge, KS v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 41 (D.D.C. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  The related claim of attempted monopolization requires pleading three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct, (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Both monopolization and attempted monopolization offenses require proof of exclusionary or predatory conduct on behalf of the would-be monopolist.  *See United States v. Microsoft*, 253 F.3d 34, 50, 80 (D.C. Cir. 2001).  Because conduct that is lawful for a monopolist would likewise be lawful for a non-monopolist, "the same basic definition of exclusionary conduct should apply to both monopolization and attempt claims."  PHILLIP E. AREEDA & HERBERT HOVENKAMP, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 806 (3rd & 4th eds. 2010-2017).

### 1.    No Leveraging Conduct

Courts have recognized monopoly leveraging under Section 2 where an exhibitor "combin[es] its closed and open towns in its negotiations for films," allowing the exhibitor to "dictate terms to the distributors[.]"  *Schine Chain Theatres*, 334 U.S. at 115-16.  By jointly negotiating for a film license to cover both geographic markets in which an exhibitor has zero competitors and markets that are more competitive, the exhibitor can leverage the monopoly

power it has achieved in the non-competitive markets to extract supra-competitive terms from the distributor in the competitive markets. *See id.*; *Griffith*, 334 U.S. at 102-10. The exhibitor is essentially treated by the distributor as if it had a monopoly in all markets, which disadvantages competing exhibitors in the competitive markets.

But the Complaint does not identify Landmark's closed towns, if any; nor does it allege that Landmark ever combined its open and closed towns in its negotiations with distributors for film licenses. Indeed, the Complaint purports to quantify Landmark's shares in only seven markets. Compl. ¶¶ 40, 47, 53, 59-62. Plaintiffs say nothing about the competitive makeup of the other 15 markets where Landmark exhibits Specialty Films. *See id.* ¶ 35. Nor are there any facts suggesting that Landmark ever explicitly or implicitly used any power in *other* geographic markets to help it dominate the three markets where *Plaintiffs* operate. *See Six W.*, 2004 WL 691680, at *11 (dismissing attempted monopolization claim, noting failure "to suggest that Loews engaged in any predatory or anticompetitive behavior," and explaining that alleged statement that defendants would try to influence distributors was insufficient).

There are no allegations that Landmark took advantage of its position in closed geographic markets to strengthen its hand in negotiations with distributors regarding open markets. Instead, there is only Plaintiffs' repeated conclusory statement that Landmark leveraged its nationwide dominant position. The Complaint does not contain sufficient facts to plausibly suggest monopoly leveraging of the likes outlined in *Schine Theatres* and *Griffith*. And pleading on information and belief that Landmark leverages national circuit power in outside markets is exactly the sort of speculative conclusion that *Twombly* and *Iqbal* hold to be inadequate to state an antitrust claim. *See* Compl. ¶¶ 6, 30, 59-62.

### 2.    No Monopoly Power

Plaintiffs' Section 2 claims fail for the additional reason that the Complaint does not adequately assert Landmark's possession of—or dangerous probability of achieving—monopoly power. Plaintiffs' Section 2 theory is predicated on Landmark's leveraging of its alleged *nationwide* circuit power to coerce distributors into granting clearances in the markets where

Plaintiffs operate.  *See, e.g.*, Compl. ¶¶ 8, 30.  But Plaintiffs fail to allege facts to plausibly establish Landmark's nationwide monopoly power that permits this leveraging to occur.  *See, e.g.*, *Griffith*, 334 U.S. at 107-08 (describing monopoly leveraging in the movie theater industry, where exhibitor uses "strategic position" gained from "monopoly of theatres" in certain towns and "buying power of the entire circuit" to "acquire exclusive privileges in a city where he has competitors").  As a fallback to their allegations about Landmark's nationwide monopoly power, Plaintiffs plead "on information and belief" that Landmark is the dominant Specialty Film exhibitor for markets other than Washington, D.C., Denver and Detroit.  However, Plaintiffs do not identify Landmark's competitors or describe the competitive conditions in any such markets.

Accordingly, apart from conclusory speculation, Plaintiffs offer nothing to support their allegation that Landmark is the nationwide dominant exhibitor of Specialty Films.  This failure provides a separate basis for dismissal of Plaintiffs' Section 2 claims.

**D.      Plaintiffs Fail to State a Plausible Claim for Tortious Interference (Count IV)**

On top of their primary Sherman Act claims, Plaintiffs assert that the same conduct also states a claim for common law tortious interference with business relations.  This claim, however, rises and falls with Plaintiffs' Sherman Act claims.  Under Washington, D.C. law, tortious interference with business relations requires proof of: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012), quoting *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).  The conduct that Plaintiffs claim establishes interference is the same conduct Plaintiffs rely on to support their antitrust claims: "Landmark has intentionally interfered . . . by coercing distributors not to enter into Specialty Film licensing agreements with Plaintiffs." Compl. ¶ 108.  Yet, as detailed above, the Complaint does not allege any facts that would support a plausible inference that Landmark has in fact coerced any distributors.  Accordingly, if the Court agrees that Plaintiffs fail to state claims

under the Sherman Act, the Court should likewise find that Plaintiffs' tortious interference claim fails as well.

**E.      Defendant 2929 Entertainment, LP Should Be Dismissed**

Plaintiffs have included Landmark's parent company, 2929 Entertainment, LP ("2929") as a Defendant in this lawsuit.  The Complaint outlines that 2929 "is the parent of Landmark." Compl. ¶ 19.  Apart from this statement, however, the Complaint does not even mention 2929, let alone allege that 2929 was involved in any of the challenged conduct.  A parent corporation is not automatically legally responsible for the actions of its subsidiaries.  *See, e.g.*, *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (holding that parent and subsidiary are only viewed as a single entity where there is "specific evidence of coordinated activity" between the two); *In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417-19 (S.D.N.Y. 2011) (dismissing parent companies from antitrust lawsuit where there were no allegations that they did anything actionable under the antitrust laws and no allegation of a basis to pierce the corporate veil); *RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1216 (D. Colo. 2004) ("The fact that CITGO is a wholly owned subsidiary of PDVSA, without more, does not subject CITGO to liability on any basis.").

Accordingly, Defendant 2929 should be dismissed from this case.

## IV.      CONCLUSION

For the foregoing reasons, Landmark respectfully requests the Court dismiss Plaintiffs' Complaint in its entirety with prejudice.

DATED: December 15, 2017

Respectfully submitted,

**PERKINS COIE LLP**

By:/s/ Thomas L. Boeder
　　　Thomas L. Boeder, Pro Hac Vice
　　　TBoeder@perkinscoie.com
　　　Cori G. Moore, Pro Hac Vice
　　　CGMoore@perkinscoie.com
　　　Laura K. Hennessey, Pro Hac Vice
　　　LHennessey@perkinscoie.com
　　　1201 Third Avenue, Suite 4900
　　　Seattle, WA 98101-3099
　　　Telephone:  206.359.8000

By:/s/Barry J. Reingold
　　　Barry J. Reingold, Bar No. 942086
　　　BReingold@perkinscoie.com
　　　700 Thirteenth Street NW, Suite 600
　　　Washington, D.C. 20005-3960
　　　Phone: 202.654.6200
　　　Fax: 202.654.6211

*Attorneys for Defendants Silver Cinemas
Acquisition Co. D/B/A Landmark Theatres, et
al.*