**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 2301 M CINEMA LLC D/B/A/ WEST END CINEMA, et al.,<br><br>                Plaintiffs,<br>    v.<br><br>SILVER CINEMAS ACQUISITION CO. D/B/A LANDMARK THEATRES,<br><br>                Defendant. | Civil Action No. 1:17-cv-1990 (EGS) (RMM) |

**LANDMARK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL LANDMARK'S RESPONSE TO PLAINTIFFS' FIRST INTERROGATORY**

Defendant Silver Cinemas Acquisition Co. d/b/a Landmark Theatres ("Landmark") submits this opposition to Plaintiffs'—West End Cinema, The Avalon Theatre Project, Inc., Denver Film Society, and Cinema Detroit—Second Motion to Compel ("Motion"). Plaintiffs' Motion should be stricken for its numerous procedural defects, or, alternatively, denied in full as moot.

The Motion suffers from three critical defects that explicitly violate this Court's rules, procedures, and previous guidance on discovery. First, the Motion was improperly brought without seeking leave from the Court: a clear violation of the requirements set forth in Judge Sullivan's Standing Order. Second, the Motion violates prior requirements imposed by the Court on discovery motions: it takes one issue and devotes 20 pages of briefing to it, even though Judge Sullivan previously ordered the parties to brief several more issues in a far more succinct manner—four pages to be exact. At 20 pages, Plaintiffs' brief is five times the length previously allowed by the Court for discovery briefing. Third, the Motion improperly seeks to relitigate an issue that is already pending before the Court in the prior motion to compel on the geographic scope of discovery. Any one of these defects, on its own, would be a sufficient basis to strike or deny Plaintiffs' Motion.

Setting aside the critical defects that plague Plaintiffs' Motion, it should be denied for the additional reason that it is moot: Landmark's amended response to Plaintiffs' Interrogatory provides the information Plaintiffs seek.

But even if the Court considers Plaintiffs' request to expand the geographic scope of discovery (which is relitigated in Plaintiffs' current Motion), the Court should deny relief because the discovery sought is not proportional to the interests at stake or parties in the lawsuit.

## I.    PLAINTIFFS' MOTION IS PROCEDURALLY DEFECTIVE.

Plaintiffs' Motion is riddled with procedural deficiencies and should be stricken.  As an initial matter, and as stated in this Court's May 10, 2019 Minute Order, Plaintiffs disregarded the mandatory process for discovery motions in this case by filing without leave.[1]  Plaintiffs also disregarded Judge Sullivan's March 18, 2019 Minute Order limiting the parties' first motions to compel to four pages.  The present Motion—20 pages and five times the length previously permitted, despite covering far fewer issues—departs dramatically from the Court's instructions.  Judge Sullivan imposed a page limit to force the parties to narrow the scope of disagreements and present them succinctly, and Plaintiffs' overlength Motion only highlights the importance of that restriction.

Even if Plaintiffs' Motion were limited to four pages, however, it would still be improper.  The Motion rehashes a dispute already squarely before this Court in Plaintiffs' first motion to compel: the geographic scope of discovery concerning clearances.  *See* Dkt. No. 37 at 2 (arguing in first motion to compel, as in the Motion, that nationwide discovery related to clearances is appropriate under *Cobb* and *Flagship*); Mot. at 6 (contending their "interrogatory, *like the documents Plaintiffs seeks through their prior motion*, is undeniably relevant," and "*[a]s described in Plaintiffs' other motion to compel*, Landmark has refused to produce documents related to its clearances policies or policies outside Washington, Detroit, or Denver" (emphasis

---

[1] On May 2, 2019, over a week before this Court issued the Minute Order, Landmark identified the Motion's various procedural deficiencies and gave Plaintiffs the opportunity to withdraw or amend the Motion, but Plaintiffs declined to do so.  Declaration of Elvira Castillo ("Decl.") ¶¶ 4-7.

added)); *see also See Scruggs v. Getinge USA, Inc.*, 258 F.R.D. 177, 179 (D.D.C. 2009) (denying "defendant's motion for additional discovery as premature and cumulative because it simply repeated the request made in the still-pending motion for sanctions").  Plaintiffs could dedicate only two-thirds of a page to the issue in their first motion, and now attempt to circumvent the page restriction by filing a much longer motion on the same topic.  That the issue arises in the context of Plaintiffs' interrogatory, rather than its requests for production, is immaterial.  Because the Motion contravenes the Standing Order, disregards this Court's page limit, and relitigates a pending issue, it should be stricken.[2]

## II. LANDMARK HAS FILED A SUPPLEMENTAL RESPONSE MAKING PLAINTIFFS' MOTION MOOT.

Alternatively, this Court should deny the Motion as moot, as Landmark's Amended Responses and Objections to Plaintiffs' First Set of Interrogatories provide all the information that Plaintiffs seek through their Interrogatory and which does not concern a pending dispute.  In fact, had Plaintiffs followed the procedures and requirements on discovery disputes imposed by the Court, it is unlikely that any Motion would have been filed, since it would have quickly become apparent that there was not an actual dispute between the parties (other than one already awaiting decision from the Court).

For instance, when Landmark received the Interrogatory, it reasonably assumed that Plaintiffs sought every instance in which someone from Landmark discussed with a distributor (in written or verbal format), a clearance or their unwillingness to play day and date.  Decl. ¶ 3.  Landmark in good faith objected to the Interrogatory as unduly burdensome.  *Id.*  Nevertheless, Landmark told Plaintiffs—both in the written objection itself and on the phone during a meet and confer—that Landmark would identify *with specificity* (by bates number) every written instance responsive to the Interrogatory it came across in its document review.  *Id.* ¶ 3.  Plaintiffs'

---

[2] Plaintiffs also briefly argue that Landmark's clearance practices concerning commercial film are relevant.  Mot. at 8-9, 13-14.  Plaintiffs have always represented that the relevant product market at issue is the market for first-run specialty film, and have never before taken the position that discovery regarding first-run commercial film (which none of the Plaintiffs play) is appropriate.  Decl. ¶ 9.  Accordingly, this issue is not ripe for decision.

contention that Landmark vaguely referred Plaintiffs to their documents "en masse" and "without any specification" is simply false.[3] *See* Mot. at 2, 4, 19; Decl. ¶ 6. Worse still, when Landmark explained its interpretation of the Interrogatory, why it was burdensome, and what it intended to do, Plaintiffs said only that Landmark's response was insufficient. Decl. ¶¶ 3, 7. Plaintiffs then turned around and filed its 20-page Motion.

Remarkably, Plaintiffs' Motion actually acknowledges that Landmark's position (and objections) were *correct* and reasonable all along, and that a discovery request seeking every discussion of clearances between any Landmark employee and any distributor over an eight-year period *would be* burdensome. Mot. at 4. Plaintiffs' Motion also sets forth, for the first time, that their Interrogatory *did not seek this type of granular information.* Mot. at 5, Ex. C at 7-8; Decl. ¶ 7. Instead, Plaintiffs assert that the Interrogatory seeks what the defendant AMC did in the *Cobb* case: identify general clearance zones in its circuit. *See* Mot. at 5, Ex. C at 7-8. If this is what Plaintiffs sought, it begs the question—why did they not say so during the meet and confer with Landmark? It appears that Plaintiffs had no interest in clarifying any misinterpretation on Landmark's part or resolving the issue because they wanted to file a 20-page motion relitigating whether a nationwide scope is appropriate in this action. Absent Plaintiffs' maneuver, Landmark would have filed this response as an initial matter and the Motion would have been unnecessary. *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 202 F. Supp. 3d 1, 11 (D.D.C. 2016) (declining to intervene where party had not "demonstrate[ed] that good-faith meet-and-confer efforts had been unsuccessful").

Nevertheless, Landmark served an amended response to Plaintiffs' First Set of Interrogatories, in response to the Motion and consistent with *Cobb*, on May 9, 2019. Decl. ¶ 8,

---

[3] In a separate but also misleading statement, Plaintiffs assert that "Landmark issued 184 requests for production and 28 interrogatories." Mot. at 3. In fact, Landmark issued one set of 46 requests for production (fewer than Plaintiffs' 50 requests), and one set of seven 7 interrogatories, each individual request "with respect to each Plaintiff." Decl. ¶ 10. Each plaintiff provided identical responses to Landmark's requests for production, and their responses differed for only three interrogatories: (1) who answered or supplied information in drafting the responses, (2) who is most knowledgeable about how business records are kept, and (3) who seeks licenses for films. *Id.*

4


Ex. A.  This amended response detailing Landmark's approach to clearances in the three relevant markets moots the Motion.[4]  *Id.*

### III. THE NATIONWIDE SCOPE PLAINTIFFS SEEK IS NOT PROPORTIONAL TO THE INTERESTS AT STAKE OR PARTIES IN THE LAWSUIT.

This Court should decline to consider Plaintiffs' briefing for the reasons discussed above, but to the extent it considers Plaintiffs' arguments, expanding the geographic scope of this lawsuit would not be "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Rule 26 "was amended in 2015 to emphasize the need for proportionality in discovery and to 'encourage judges to be more aggressive in identifying and discouraging discovery overuse.'"  *Prasad v. George Wash. Univ.*, 323 F.R.D. 88, 91 (D.D.C. 2017) (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment).  In evaluating proportionality, courts consider "the importance of the issues at stake, the amount in controversy, the parties' access to the information, the parties' resources, the importance of the discovery in resolving the issues, and the burden of the discovery relative to the likely benefit."  *Buie v. D.C.*, 327 F.R.D. 1, 7, 10 (D.D.C. 2018) (J. Meriweather) ("Courts need not tolerate fishing expeditions, discovery abuse, and an inordinate expense involved in overbroad and far-ranging discovery requests.").

Here, expanding the scope of discovery to encompass the entire nation would be unduly burdensome and excessively costly.  Document review provides a specific illustration of the costs and associated burdens involved with allowing a nationwide scope for discovery on this case, rather than adopting an approach that is proportional to the interests at stake and tailored to the allegations in the complaint and the unique product market at issue (specialty film).

For instance, Landmark has already reviewed almost 22,000 documents and has produced over 4,000 (more than 14,000 pages) as part of its ongoing rolling production.  Decl. ¶ 11.  The

---

[4] Landmark's amended response moots the entire Motion, despite covering only the three relevant markets.  As discussed above, the geographic scope of Landmark's response is a separate question raised in Plaintiffs' first motion to compel.

cost to review these documents was approximately $200,000.[5] *Id.* This review included three dozen search terms which were tailored to the allegations in the complaint and the relevant markets and theaters at issue (i.e., most but not all the searches included geographic modifiers). *Id.* In addition to the searches and review Landmark has already completed, it has offered to run an additional 26 searches (62 total) and review approximately 17,000 additional documents applying the geographic limitations currently in place. *Id.* ¶ 12. The combined total cost for this review would be approximately $400,00-500,000. Plaintiffs' counterproposals, which assume that a nationwide geographic scope is appropriate for discovery and would involve reviewing almost 50,000 additional documents, expand the universe of documents to be reviewed significantly and could total over a million dollars.[6] *Id.* ¶ 13.

Balancing this significant expense against the amount in controversy, as Rule 26(b) requires, is difficult, as Plaintiffs have refused to provide even an estimate of their alleged damages.[7] Expanding the document universe by orders of magnitude and increasing document review costs to hundreds of thousands or millions of dollars would be inequitable where Plaintiffs refuse to even estimate what this case is worth. *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 7 (D.D.C. 2017) ("[C]ourts should 'compare the cost of discovery to the amount in controversy to determine the proposed discovery's proportionality.'" (citation omitted)); *see also Conn. Gen. Life Ins. Co. v. Scheib*, No. 11-CV-0788-GPC-WVG, 2013 WL 485846, *4 (S.D. Cal. Feb. 6, 2013) (holding that requesting party would have to pay costs or forego discovery where cost of complying with electronic discovery request exceeded

---

[5] This number accounts for discovery attorney time and tech support for the platform used, which was over $100,000, as well as additional attorney time which is estimated on the low end to be an additional $100,000 (and on the high end closer to $150,000). Decl. ¶ 11.

[6] The parties are still negotiating search terms and trying to reach agreement. Nevertheless, Landmark maintains its position that information exclusively regarding geographic markets and theaters not at issue in the litigation should not be discoverable.

[7] Landmark's pending motion to compel argues that Plaintiffs are obligated to provide a preliminary damages estimate under the Federal Rules. *See* Dkt. No. 38 at 3-4.

amount in controversy). This Court should assume the amount in controversy is de minimis for purposes of the Motion.

However, even if the Court were to assume that the alleged damages are more than de minimis, they are still miniscule compared to *Cobb* and the other movie theater antitrust cases on which Plaintiffs' arguments hinge. Both *Cobb* and this lawsuit are about movies, but the similarities end there. The product market in *Cobb* (and in all other movie theater antitrust cases) is first-run, wide-release commercial film. The present case, by contrast, deals with niche specialty film which accounts for an infinitesimally smaller amount of revenue than wide-release, first-run commercial film.[8] There is no obvious reason the caselaw or scope of discovery from litigation concerning wide-release commercial film applies here.[9] Plaintiffs themselves have conceded the product market for art film is distinct from wide-release first-run commercial film, Compl. ¶ 32, and that "all proportionality determinations must be made on a case-by-case basis," Mot. at 8 (citation omitted).

Moreover, three of the four Plaintiffs are "public charities"—not-for-profit theaters.[10] As public charities, they pay no taxes. As public charities, they receive grants from the government, foundations, and donors. And as public charities, they simply do not represent the same interests

---

[8] For example, the national total domestic gross of "My Cousin Rachel," a specialty film discussed in the Complaint, was $2,716,368. *See* Box Office Mojo, https://www.boxofficemojo.com/movies/?id=mycousinrachel.htm (last visited May 24, 2019). That gross is 1.2 percent the total gross of the wide-release commercial film, "Mission Impossible: Fallout" which grossed $220,159,104. *See* Box Office Mojo, https://www.boxofficemojo.com/movies/?id=missionimpossible6.htm (last visited May 24, 2019). Even a specialty "hit" like "Room" (a film with cross-over appeal likely to have more runs than the average specialty film) grossed 2.1 percent of the total box office revenue of a commercial wide-release "hit" like "Black Panther." *See* Box Office Mojo, https://www.boxofficemojo.com/movies/?id=room2015.htm (last visited May 24, 2019) (showing total domestic gross for "Room" as approximately $14.7 million) and https://www.boxofficemojo.com/movies/?id=marvel2017b.htm (last visited May 24, 2019) (showing total domestic gross for "Black Panther" as approximately $700 million).

[9] Plaintiffs' reliance on the *Flagship* case to suggest a small amount of damages nevertheless justifies nationwide discovery is particularly inapt. Mot. at 17. *Flagship* concerned first-run, wide-release commercial film. And the damages sought by Plaintiffs in that case were over 9 million dollars (before taking trebling into account, which brought the total to 27 million dollars). Here there is not even a remote suggestion that Plaintiffs' damages would come close to that number, particularly when one considers the fact that three out of four Plaintiffs are public charities and are dealing with a niche product that, as explained above, accounts for a tiny percentage of the amount at stake and in controversy when dealing with wide-release commercial film.

[10] Plaintiff West End is a small, art theater that went out of business in March 2015.

as those represented by the plaintiff in the *Cobb* litigation.[11] Unlike Plaintiffs in this case, Landmark, Cobb, and every other party involved in previous movie theater antitrust litigation (defendant and plaintiff alike), must actually generate revenue and profit for themselves and distributors; innovate, produce and perform; and vigorously compete for film and patrons (as for-profit businesses must do by definition). At the very least, the scope and volume at issue here is so small when compared with that at stake in other movie theater antitrust cases that there is simply no justification for adopting the "what happened in *Cobb* should happen here" approach that Plaintiffs persist in advancing. Nationwide discovery may have been appropriate in *Cobb* and other cases involving wide-release commercial film, but it is not here, where this Court must assume that "the cost will be so expensive as to overtake the value of this litigation."[12] *Arrow Enter. Computing Sols., Inc. v. BlueAlly, LLC*, No. 5:15-CV-37-FL, 2017 WL 876266, at *4 (E.D.N.C. Mar. 3, 2017).

*Cobb* is also helpful in highlighting the relative resources at stake, another factor in the proportionality inquiry. Plaintiffs point out that Landmark "operates 49 theaters with 234 screens and 24 major metropolises." Mot. at 17. While Landmark is certainly bigger than Plaintiffs, it is tiny compared to AMC, for example, which is estimated to be a 5.1-billion-dollar company with over 8,200 screens in 661 theatres across the country. *See* Wikipedia, *AMC Theatres*, https://en.wikipedia.org/wiki/AMC_Theatres#cite_ref-5 (last visited May 24, 2019). In any event, Rule 26 functions to "prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent" and does not "justify unlimited

---

[11] If businesses in other markets (which Plaintiffs purport to represent) thought Plaintiffs' lawsuit had any validity, they could have joined this litigation. They did not. And the fact that they did not speaks volumes. Plaintiffs' attempts to expand discovery to have nationwide reach are too far a stretch from the niche, unique, and localized interests they actually represent, particularly as public charities.

[12] Plaintiffs incorrectly assert that Landmark "has requested the *very same* documents" from Plaintiffs. Mot. at 13. Landmark requested that Plaintiffs produce all documents concerning clearances, but Plaintiffs' theaters are located only in the three markets; their documents will concern primarily, if not entirely, the three relevant markets or perhaps circuit-wide clearance policies, neither of those categories being in dispute. *See* Dkt. No. 40, Ex. A at 5. As to San Francisco, Houston, and St. Louis, Landmark simply requested documents supporting Plaintiffs' allegations in the Complaint related to those three cities. Dkt. No. 40, Ex. A at 10.

discovery requests addressed to a wealthy party." Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment.

Neither does the significance of the issues at stake favor Plaintiffs. The importance of the issues is "measured in philosophic, social, or institutional terms," for example, matters concerning employment practices or free speech. *Id.*; *see also Arrow*, 2017 WL 876266, at *4 ("These issues include 'cases in public policy' or ones that 'seek to vindicate vitally important personal or public values[.]'" (citation omitted)). Even accepting as true Plaintiffs' allegations that consumers have been harmed, this is far from an important public policy case. Moreover, courts have recognized that clearances actually increase interbrand competition between distributors of different art films. *See, e.g.*, *Theee Movies of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1399 (9th Cir. 1987) (clearances "encouraged interbrand competition by forcing [exhibitor] to find alternative subrun movies"). And "the mere fact that a consumer who might, for example, prefer to watch a film at [a Plaintiff's theater] has to instead go to another nearby theatre to see that film does not mean that there has been an actionable harm to consumer choice or competition." *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97-CV-5499-LAP, 2004 WL 691680, at *10 (S.D.N.Y. Mar. 31, 2004) (citation omitted).

As to the importance of the discovery in resolving the issues in this case, this factor also weighs in favor of limiting the scope of discovery. Critically, Landmark is producing not only documents concerning clearances that pertain exclusively or in part to one or more of the three markets, *but also documents concerning clearances generally or circuit-wide* (to the extent that they exist). Decl. ¶ 14. In other words, Landmark is producing any and all documents (and providing information) about any clearance policies or practices at issue in the three relevant geographic markets, as well as clearance policies or practices that potentially impact the three relevant geographic markets.[13] *Id.* Given the unique product market involved (niche specialty

---

[13] For example, Landmark has agreed to search for and produce any documents that reference the Plaintiff theater names (without any modifiers). Decl. ¶ 14. In other words, if Landmark were leveraging some purported "power" to get an advantage over one of Plaintiff's theaters, it is difficult to see how it would express that without referencing one of Plaintiff's theaters by name.

9

film), the miniscule amount at stake, and Plaintiffs' access to information about Landmark's clearances generally, nationwide, and in the three markets at issue, there simply is no justification to allow expansive nationwide discovery which would be costly and burdensome, particularly when weighed against the interests at stake and likely minimal benefits.

## IV. CONCLUSION

Landmark requests that this Court strike Plaintiffs' Motion, or in the alternative, either deny it in full as moot or deny it as disproportionate under Rule 26.

Date:  May 24, 2019

Respectfully submitted,

**PERKINS COIE LLP**

By:/s/ Thomas L. Boeder
Thomas L. Boeder, Pro Hac Vice
TBoeder@perkinscoie.com
Elvira Castillo, Pro Hac Vice
ECastillo@perkinscoie.com
Alison Caditz, Pro Hac Vice
ACaditz@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Tel:  206-359-8000
Fax: 206-359-9000

Barry J. Reingold, Bar No. 942086
BReingold@perkinscoie.com
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Tel: 202-654-6200
Fax: 202-654-6211

*Attorneys for Defendants Silver Cinemas Acquisition Co. D/B/A Landmark Theatres*

## CERTIFICATE OF SERVICE

      I certify that on May 24, 2019, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

| | |
|---|---|
| Michael David Hausfeld<br>Sathya S. Gosselin<br>Sarah R. LaFreniere<br>Paul Gallagher<br>Hausfeld LLP<br>1700 K. Street, NW<br>Suite 650<br>Washington DC, 20006<br><br>*Attorneys for Plaintiffs 2301 M. Cinema LLC D/B/A West End Cinema, Avalon Theatre Project, Inc.,*<br>*Denver Film Society* | \_\_\_ Via hand delivery<br>\_\_\_ Via U.S. Mail, 1st Class, Postage Prepaid<br>\_\_\_ Via Overnight Delivery<br>\_\_\_ Via Facsimile<br>_X_ Via CM/ECF Email<br>\_\_\_ Other: _____ |
| Irving Scher<br>Hausfeld LLP<br>33 Whitehall Street,<br>14th Floor,<br>New York, NY 10004<br><br>*Attorneys for Plaintiffs 2301 M. Cinema LLC D/B/A West End Cinema, Avalon Theatre Project, Inc., Denver Film Society* | \_\_\_ Via hand delivery<br>\_\_\_ Via U.S. Mail, 1st Class, Postage Prepaid<br>\_\_\_ Via Overnight Delivery<br>\_\_\_ Via Facsimile<br>_X_ Via CM/ECF Email<br>\_\_\_ Other: _____ |
| Kathryn A. Reilly<br>Natalie West<br>Wheeler Trigg O'Donnell LLP<br>370 17th St., Suite 4500,<br>Denver, CO 80202<br><br>*Attorneys for Plaintiffs Denver Film Society* | \_\_\_ Via hand delivery<br>\_\_\_ Via U.S. Mail, 1st Class, Postage Prepaid<br>\_\_\_ Via Overnight Delivery<br>\_\_\_ Via Facsimile<br>_X_ Via CM/ECF Email<br>\_\_\_ Other: _____ |

Date:  May 24, 2019

                                              /s/ Thomas L. Boeder
                                              Thomas L. Boeder
                                              *Attorneys for Defendant Silver Cinemas*
                                              *Acquisition Co. D/B/A Landmark Theatres*